**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael S. BRANDON,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Melanie R. SMITH, Defendant–Appellee.**

**Nos. 78–3273, 78–3366.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 13, 1979.

Decided Oct. 22, 1980.

Rehearing and Rehearing En Banc Denied
in No. 78–3366 Dec. 18, 1980.

---

Richard A. Hodge, San Francisco, Cal., for Brandon.

David B. Bukey, Asst. U. S. Atty., Seattle, Wash., for Smith.

Robert E. Prince, Seattle, Wash., on brief; Gordon A. Woodley, Seattle, Wash., for United States.

Before GOODWIN and KENNEDY, Circuit Judges, and MURRAY,* District Judge.

FRANK J. MURRAY, District Judge:

Michael Brandon, defendant/appellant, appeals from his conviction of one count of conspiracy to distribute cocaine (Count I) in violation of 21 U.S.C. § 846, and two substantive counts of possession with intent to distribute cocaine (Counts II and III) in violation of 21 U.S.C. § 841(a)(1).[1]

Melanie Smith, defendant/appellee, was also indicted on the same three counts, and was found guilty only on the conspiracy count. The United States appeals from the allowance of the post–trial motion of acquittal of Melanie Smith on the conspiracy count. Fed.R.Crim.P. 29.[2]

**I**

Appellant Brandon's first claim is that the district court erred when it denied his motion to suppress the evidence of his three telephone conversations and a face–to–face conversation with the Government's informant, Raymond Bracelin. Appellant contended that Bracelin's apparent consent to the Government's monitoring and tape recording of the conversations was not voluntarily given, but was induced by threats and coerced by Government agents. The motion was heard by a magistrate, who received evidence and made written findings of fact. After a *de novo* evidentiary hearing the district court modified the magistrate's findings and, as modified, adopted them, and denied the motion. At the trial the challenged evidence was admitted in evidence.

The findings of the relevant events leading to Bracelin's consent to cooperate with the Government agents follow. In the evening of March 2, 1978 Bracelin was at his home in Seattle, Washington, and in possession of cocaine. He was with Ben Yarbrough, with whom he had previously become acquainted and who had posed as an international drug dealer. Yarbrough sought to convince Bracelin to sell him the cocaine on hand, but Bracelin refused. In fact Yarbrough was a Drug Enforcement Agent (DEA), but Bracelin had no knowledge of this until about midnight when Yarbrough drew his weapon and arrested

---

* The Honorable Frank J. Murray, Senior United States District Judge for the District of Massachusetts, sitting by designation.

1. Charles E. Kuhn also was indicted and convicted of the three counts. Kuhn appealed his conviction, but later withdrew his appeal and is no longer a party in these proceedings on appeal.

2. At the close of the prosecution's evidence, the United States acquiesced in the dismissal of Count II against defendant, Melanie Smith, and the jury found her not guilty of Count III.

him for conspiracy and for possession of narcotics. After a pre–arranged signal given by Yarbrough, six DEA agents beat on the door to Bracelin's home and were admitted by Yarbrough. The newcomers with guns displayed searched through the premises for other persons, and brought Bracelin's wife and two teenage sons to the room where Bracelin was held. In a short space of time Bracelin's wife and sons were instructed to return to their rooms elsewhere in the home.

Bracelin was then informed of his rights by the DEA agents. In the discussion that followed the agents told him that he could face as much as thirty years in prison, and that they were giving him a break by not charging his wife. They also advised him that he had friends who were involved by reason of tape–recorded conversations. However, no threats to charge any of Bracelin's friends were made. The agents told Bracelin he would be prosecuted and probably would be imprisoned unless he cooperated in assisting the agents with the investigation of his California source of cocaine. He was also told by them that if he cooperated, they would make that fact known to the United States Attorney and recommend leniency, and that such recommendation in other cases in the past had carried great weight. Bracelin understood from the agents they could make no firm promises to him. When Bracelin expressed concern that he might lose his real estate license, Yarbrough responded that his involvement in the drug situation need not get back to Bracelin's employer.

Bracelin indicated he was inclined toward cooperation but first wished to talk with his attorney. He was permitted to call the attorney and consult with him, and the next morning, March 3, Bracelin and his attorney met with the United States Attorney and an Assistant United States Attorney. During this meeting Bracelin agreed to cooperate. Upon learning he would be charged only with possession of cocaine, Bracelin

identified defendant Brandon as his California source. Thereafter, Bracelin participated in three telephone conversations with Brandon; two on March 3, and the third on March 6. Each conversation was tape recorded by the agents with Bracelin's knowledge and consent. On March 7, Bracelin consented to the use of a transmitter during his conversation with defendant Brandon at a face–to–face meeting in Seattle. The district court found that Bracelin's agreement to cooperate with the DEA agents was free and voluntary and not the result of coercion "expressed or implied".

■ Unless Bracelin's consent to cooperate was voluntarily given, the conversations between him and Brandon were not admissible in evidence under 18 U.S.C. § 2511(2)(c).[3] It was essentially a question of fact whether under all the circumstances consent was voluntarily given or coerced. The district court's finding of voluntary consent must stand unless it is clearly erroneous. *United States v. Ryan*, 548 F.2d 782, 788–91 (9th Cir.), *cert. denied, sub nom. Zeldin v. United States*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 782 (1976), *cert. denied, Ryan v. United States*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977). In such circumstances, it is the duty of the appellate court to examine the entire record and make an independent determination of the issue of voluntariness. *See Beckwith v. United States*, 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1616–17, 48 L.Ed.2d 1 (1976).

The district court's subsidiary findings, based upon the testimony of witnesses whose credibility the magistrate and court had the opportunity to assess, have not been shown to be clearly erroneous. Defendant Brandon's contention that the district court erred is predicated upon the defendant's version of the events leading to Bracelin's decision to cooperate with the agents. However, we find his summary, and the arguments offered to support it, lacking in

**3.** 18 U.S.C. § 2511(2)(c), in pertinent part, reads:

It shall not be unlawful ... for a person acting under color of law to intercept a wire

or oral communication, where ... one of the parties of the communication has given prior consent to such interception.

justification of its contradictions of certain district court findings,[4] and its glaring omission of Bracelin's meetings with his own attorney and with a member of the United States Attorney's staff before giving his consent to cooperate with the Government.

The district court's ultimate conclusion that consent was voluntarily given rests upon findings legally sufficient to support the conclusion. *United States v. Ryan, supra.* We reject the defendant's contention that the agents' promise to bring the fact of Bracelin's cooperation to the attention of the United States Attorney and to recommend leniency, and Bracelin's expectation of it, constituted coercion. *Good v. United States,* 378 F.2d 934, 936 (9th Cir. 1967); *see United States v. Glasgow,* 451 F.2d 557, 558 & n.2 (9th Cir. 1971). Nor do we agree that a realistic description of an accused's predicament created by his violation of the criminal law, called to his attention to obtain his cooperation with Government agents, will vitiate his consent. *See United States v. Snyder,* 428 F.2d 520, 521–22 (9th Cir.), *cert. denied,* 400 U.S. 903, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970); *Fernandez–Delgado v. United States,* 368 F.2d 34, 35–36 (9th Cir. 1966). Bracelin's consent was not given until his meeting with a staff member of the United States Attorney several hours after his arrest, and after consultation with an attorney of his choice. Whatever may have been the impact of the dramatic arrest, and the entrance into his home of the six armed agents around midnight, on Bracelin's subjective state, the district court could properly conclude that Bracelin's consultation with his attorney several hours after the arrest obviously enhanced the voluntariness of the consent. *United States v. Glasgow, supra* at 558; *Jordan v. United States,* 421 F.2d 493, 496–97 (9th Cir. 1970). Because of Bracelin's consultation with his attorney the case before us is even stronger for the Government than *Ryan. See id.* at 794–95 (dissenting opinion). We conclude that the court properly ruled admissible in evidence against Brandon the conversations to which Bracelin was a party.

## II

Appellant Brandon next claims that the district court erred when it refused to submit his entrapment defense to the jury. Brandon argues that the evidence at the trial indicated that the criminal design involved in the charges contained in the indictment originated with the Government agents, and therefore that the entrapment issue was a jury question.

There was evidence that during the first discussions between Bracelin and Yarbrough in late 1977 or early 1978, Bracelin was not interested in becoming involved with traffic in cocaine, and tried to dissuade Yarbrough from seeking to obtain cocaine through him. However, Yarbrough persisted, and ultimately talked with Bracelin into starting the venture. Bracelin twice travelled to San Francisco in February 1978 to obtain cocaine for Yarbrough. On both occasions Bracelin saw Brandon. Bracelin had never met Brandon before the first encounter in San Francisco; he was referred to Brandon by a friend in Seattle. On Bracelin's first visit to the San Francisco area Brandon displayed two samples of cocaine for Bracelin to try, and on the second visit Brandon drove Bracelin around the Bay Area looking for cocaine. On both occasions Brandon expressed reluctance to become involved in cocaine transactions. On March 2 Brandon travelled to Seattle and supplied Bracelin with an ounce of cocaine, which Bracelin received for his own use. Bracelin noticed in his meetings with Brandon in February that Brandon looked like one who abused cocaine. These events occurred before Bracelin's arrest on March 2, before he knew Yarbrough was an agent, and before he agreed to cooperate with the DEA agents.

On March 7 Brandon and Kuhn, under assumed names, flew to Seattle and met with Bracelin and Yarbrough. Brandon

---

4. In his argument defendant persisted in asserting, contrary to the district court's findings, that the agents had threatened prosecution of Bracelin's wife and friends.

met with Bracelin and described the two ounces of cocaine he had brought as better than the last batch. Brandon told Yarbrough that he normally dealt in half pound quantities. At that time, Brandon asked Yarbrough if he was wearing a transmitter, and expressed concern whether Yarbrough was an undercover agent.

Brandon did not testify, and the testimony of his possession of samples and of his statement that he normally dealt in large quantities of cocaine stand undisputed. Without Yarbrough's activity, probably Bracelin and Brandon would never have become involved in the transaction alleged in the indictment.

 The defense of entrapment must be submitted to the jury when the evidence presents issues of fact that there was inducement of the defendant by a Government agent to commit the acts charged, and that the defendant was not predisposed to commit the offense "at any propitious opportunity". *United States v. Payseur*, 501 F.2d 966, 970–71 (9th Cir. 1974); *United States v. Christopher*, 488 F.2d 849, 850–51 (9th Cir. 1973). The court may properly refuse to give an entrapment instruction to the jury when a rational view of the evidence does not support the defense. *United States v. Glassel*, 488 F.2d 143, 146 (9th Cir. 1973), *cert. denied* 416 U.S. 941, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). *See also United States v. Demma*, 523 F.2d 981, 984 n.4 (9th Cir. 1975) (en banc). Such refusal, when request for a proper entrapment instruction is made, constitutes a determination as matter of law that the defense may not be raised.

 Brandon did not testify, and the evidence offered to the jury failed to present any support for his claims of lack of predisposition, "the crux of the entrapment defense". *United States v. Glaeser*, 550 F.2d 483, 487 (9th Cir. 1977). On the other hand, there was evidence which clearly demonstrated predisposition to become involved in the criminal activity. Even though no transactions occurred at their meetings in the San Francisco area in February 1978, Brandon showed no hesitancy in displaying to Bracelin, a stranger, samples of cocaine after minimal inducement on Bracelin's part. Brandon's familiarity with cocaine sources was corroborated by Brandon's appearance as one who used cocaine. His subsequent conduct in travelling to Seattle under an assumed name to meet with Bracelin demonstrated a significant degree of familiarity with underground traffic in drugs. His statements to Yarbrough reflected the natural wariness of one fearful of being apprehended as a drug peddler. Brandon's protestations of reluctance to become involved with cocaine can only be viewed as being completely overborne by the undisputed evidence of his conduct manifesting readiness to become involved. Moreover, fear of apprehension by undercover agents using electronic surveillance does not constitute lack of predisposition to become involved in criminal activity. The judge correctly refused to submit the entrapment defense to the jury.[5]

### III

The United States seeks by its appeal to reinstate the jury verdict of guilty on the conspiracy count (Count I) of the defendant/appellee, Melanie Smith. The appellee contends that the appeal is violative of the protection guaranteed her by the Double Jeopardy Clause of the Fifth Amendment, and therefore that the appeal should be dismissed. We disagree.

 Double jeopardy does not bar an appeal by the Government under 18 U.S.C. § 3731 where, as in this case, reversal of the district court order allowing the defend-

---

5. We need not reach the Government's contention that no entrapment could occur from Bracelin's acts before his arrest on March 2. It is not disputed that Bracelin had no knowledge that Yarbrough was a Government agent before the arrest. As a private citizen, not cooperating with the Government, Bracelin's approach to Brandon before March 2 was not Government solicitation or inducement. *See United States v. Glaeser*, 550 F.2d 483, 486 n.2 (9th Cir. 1977) (dictum); *United States v. Jenkins*, 470 F.2d 1061 (9th Cir. 1972), *cert. denied* 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973).

ant/appellee Smith's post–trial motion for acquittal would not subject the appellee to a new trial, but would result only in reinstating the jury's verdict of guilty. *United States v. Wilson,* 420 U.S. 332, 342, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232 (1975); *United States v. Dreitzler,* 577 F.2d 539, 544–45 & n.7 (9th Cir. 1978), *cert. denied* 440 U.S. 921, 99 S.Ct. 1246, 59 L.Ed.2d 473 (1979); *see also Sanabria v. United States,* 437 U.S. 54, 63, 98 S.Ct. 2170, 2178, 57 L.Ed.2d 43 (1978) (dictum). We reject appellee's argument that she would be placed twice in jeopardy if later she should successfully appeal a reinstated conviction. Appeal by a defendant is an exception to the double jeopardy bar against retrial. *Cf. United States v. Scott,* 437 U.S. 82, 93–94, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65, *rehearing denied* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 197 (1978).

Appellee's Rule 29 motion for judgment of acquittal on the conspiracy count (Count I) asserted that the verdicts on the conspiracy count and the substantive count (Count III) were inconsistent, and that the evidence was insufficient to support a finding of guilt of conspiracy. After hearing, the district court allowed the motion, commenting that there was "insufficient evidence to support" the verdict of guilty, and that the verdicts on Count I and Count II "are inconsistent and mutually exclusive".

■ We need not discuss at length the issue of inconsistency of the verdicts, for the appellee does not contend that the district judge held that an inconsistent verdict would compel an acquittal on the remaining count as matter of law. But in any event, it is not required that verdicts be consistent even when a conviction is rationally incompatible with an acquittal. *United States v. Green,* 594 F.2d 1227, 1230 (9th Cir.), *cert. denied* 444 U.S. 853, 100 S.Ct. 108, 62 L.Ed.2d 70 (1979); *United States v. Miller,* 546 F.2d 320, 325 (9th Cir. 1976); *United States v. Garcia,* 527 F.2d 473, 474 (9th Cir. 1975). *See also Hamling v. United States,* 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974). Rather, appellee argues that the acquittal on Count III was an important factor in the district judge's de-

termination that there was insufficient evidence to support the guilty verdict.

The jury could have found the following facts on the evidence presented. Brandon and Kuhn returned to San Francisco about 5 p. m. on March 7, 1978. Brandon had met Bracelin earlier that day in Seattle and there completed the transaction involving sale of two ounces of cocaine for $4800. About 8:30 p. m., DEA agent Davis saw a young woman wave money at Kuhn, whom the jury found to be a member of the conspiracy charged in Count I. Kuhn had bills totalling $700 in his wallet when arrested a few hours after his conversation with the young woman. The bills were on the list of the prerecorded $4800 given to Brandon in Seattle for the cocaine. Davis described the young woman as "nicely dressed" in a red dress, about 5′7″ to 5′8″ in height, and blonde. Davis had had Kuhn under observation from Kuhn's arrival at San Francisco Airport, and from there to his place of employment in San Rafael. Davis saw Kuhn leave his place of employment and meet with the young woman.

Shortly after 9:00 p. m. on March 7, DEA agent Wakabayaski followed a BMW motor vehicle from 14th and Geary Street to San Francisco Airport. The BMW was operated by a young blonde woman, "dressed up" in a red dress, and about 5′6″ to 5′7″ tall. The BMW moved out toward the airport shortly after the departure from 14th and Geary of a Porsche driven by Brandon. The BMW reached the top floor of the airport garage; the woman driver and a male left the vehicle and, standing at the garage rail, looked toward the United Airlines Terminal for about five minutes; the two returned to the BMW and the woman opened and quickly closed the vehicle's trunk; almost immediately the Porsche, driven by Brandon a few moments earlier, parked beside the BMW with only two feet separating the drivers of the vehicles; shortly thereafter the BMW was driven to the fourth floor of the garage and the woman driver and male occupant left the vehicle; the Porsche left the parking area. About 9:55 p. m. DEA agent Yarbrough and Brandon met in front of the

United Airlines Terminal. Yarrough was seeking six ounces of cocaine. Brandon drove away in a Porsche, returned several minutes later and, without stopping, continued on past Yarrough without acknowledging the latter.

The BMW belonged to appellee, Melanie Smith, and contained papers with her name thereon. The BMW was towed from the airport parking area about 3:00 a. m. on March 8 by the sheriff's deputies. Neither the appellee nor anyone else reported the BMW stolen. The garage supervisor, Jose Maldonado, made a courtroom identification of the appellee, Melanie Smith, as the woman who, at about midnight March 7, told him she could not locate her BMW which she parked on the fourth floor of the garage. At that time Smith was wearing a dress and heels and, perhaps, a coat. Maldonado did not remember the color of the dress. At about 3:00 a. m. on March 8 Smith again talked to Maldonado, who offered to assist in locating the BMW. He told her how to report the car missing. She said she was going to the sheriff's department. However, she did not report the car missing.

The DEA agents obtained a warrant to search the BMW, and found in the trunk plastic baggies containing cocaine placed inside a business envelope. The cocaine delivered by Brandon in Seattle was similarly packaged in a bank–type envelope. In the courtroom Davis and Wakabayaski could not positively identify Melanie Smith as the red–dressed woman they saw on March 7. Davis testified that Smith resembled the red–dressed woman in color of hair, height and being nicely dressed. Wakabayaski testified that Smith's features were similar to the woman in the red dress, but that Smith's hair was longer.

When passing on the Rule 29(c) post–trial motion for judgment of acquittal, the district court was required to view the evidence, which was before the jury when it returned the verdict of guilty, in a light most favorable to the Government and determine whether there was relevant evidence from which the jury could reasonably find the appellee guilty beyond a reasonable doubt. *United States v. Dreitzler, supra* at 545. The standard of review on the appeal from the district court's order is not different. *United States v. Anderson,* 532 F.2d 1218, 1223 (9th Cir.), *cert. denied* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976). In this court the evidence before the jury must be considered in the light most favorable to support the verdict, and must be such from which guilt of the defendant as charged in the indictment could reasonably be found by the jury beyond a reasonable doubt. *United States v. Schoenhut,* 576 F.2d 1010, 1014 (3rd Cir.), *cert. denied* 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978).

The sufficiency of the evidence is challenged on two grounds: (1) the identity of appellee Melanie Smith as the "woman in the red dress", and (2) Smith's participation in the conspiracy charged in Count I. Because we believe that the evidence viewed in the light most favorable to the verdict tended to show beyond a reasonable doubt that appellee was a participant in the conspiracy with Brandon and Kuhn, we vacate the judgment of the acquittal.

"Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances'." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), citing *United States v. Manton,* 107 F.2d 834, 839 (2d Cir. 1938), *cert. denied* 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). Where, as here, the jury found the defendant/appellee guilty of conspiracy beyond a reasonable doubt, in reviewing the district court's order we may not disregard inferences that the jury could draw from the evidence, if there was sufficient evidence to submit the case to the jury on the issue of conspiracy in the first place. *United States v. Cooper,* 567 F.2d 252, 253 (3rd Cir. 1977). *See Glasser v. United States, supra* 315 U.S. at 80, 62 S.Ct. at 469. Because the Government did prove the existence of a conspiracy, the prosecution had only to introduce evidence tending to show beyond a reasonable doubt that

Smith had at least a slight connection with the conspiracy. *United States v. Thomas*, 586 F.2d 123, 127 (9th Cir. 1978); *United States v. Dunn*, 564 F.2d 348, 357 (9th Cir. 1977).

No witness positively identified the defendant/appellee Smith except Maldonado, the garage supervisor. The testimony of DEA agents, Davis and Wakabayaski, that there was resemblance between Smith and the "woman in the red dress" is relevant as a circumstance tending to show identity. *Thomas v. United States*, 343 F.2d 49, 53 (9th Cir. 1965); *United States v. Campbell*, 466 F.2d 529, 531 (9th Cir.), cert. denied 409 U.S. 1062, 93 S.Ct. 571, 34 L.Ed.2d 516 (1972); *United States v. Maestas*, 546 F.2d 1177, 1181 (5th Cir. 1977). The additional evidence of Smith's ownership of the BMW, that Smith knew where it had been parked in the garage, and her refusal of offer of assistance through available channels to locate the BMW which then contained cocaine, were circumstances from which permissible and reasonable inferences could be drawn by the jury in evaluating the claim of the Government that Smith was the "woman in the red dress". The jury could reasonably conclude, in light of this evidence, that the possibility that another woman, resembling Smith, had driven Smith's car to the garage, left it there, and did not return for the car or its contents of cocaine, would appear too remote to credit, and that any doubts that Smith had driven the car to the garage were not reasonable. *United States v. Winn*, 577 F.2d 86, 91 (9th Cir. 1978); *United States v. Prohart*, 469 F.2d 1089, 1090 (9th Cir. 1972).

In determining the issue whether Smith was a participant in the conspiracy between Brandon and Kuhn which the jury found existed, the evidence, whether direct or circumstantial or both, must convince the jury beyond a reasonable doubt that Smith knew of the conspiracy and, knowing it, intentionally did some act to assist in carrying it on. The combination of circumstances and timing of events established by the evidence here, and the reasonable inferences to be drawn from such evidence of Smith's knowledge of and interest in Brandon's activities are sufficient to support the verdict of guilty which the jury returned. *See United States v. Rosales*, 584 F.2d 870, 873 (9th Cir. 1978); *see also United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978). The jury, of course, was not compelled to convict upon the evidence presented to them, but reasonable minds could find from the evidence a combination and chain of events which, with the permissible inferences to be drawn therefrom, were indicative of guilt.

The defendant/appellee refers us to *United States v. Duckett*, 550 F.2d 1027 (5th Cir. 1977). *See also United States v. Weaver*, 594 F.2d 1272 (9th Cir. 1979). In these cases the court held the evidence insufficient to establish the defendant's guilt of conspiracy. Of course, conspiracy cases do not emanate from a fixed mold or follow a pre-existing pattern, and each case has its own distinguishing circumstances. Nevertheless we have examined *Duckett*, and also *Weaver*, and find them distinguishable from the case before us on the important issue of defendant's knowledge of the presence of contraband. The evidence here is clear that there was cocaine in the trunk of the BMW owned by Smith, and knowledge of its presence may be inferred from the fact that the woman driver of the BMW opened the trunk and that Smith never reported that the car was missing from the garage. We are satisfied that the evidence considered in a light most favorable to the Government enabled the jury to find Smith guilty beyond a reasonable doubt.

The judgment of conviction of defendant/appellant Brandon is affirmed. The judgment of acquittal of defendant/appellee Smith is reversed, and her conviction is ordered reinstated.

SO ORDERED.