**UNITED STATES, Appellant,**

v.

**Albert J. SELL, Appellee.**

**No. 84–318.**

District of Columbia Court of Appeals.

Argued Sept. 11, 1984.

Decided Jan. 23, 1985.

John M. Facciola, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, Cary M. Feldman and Wendy Bebie, Asst. U.S. Attys., Washington, D.C., were on the briefs for appellant.

Eric J. Branfman, Washington, D.C., with whom Robert E. Greenberg and Robert E. Deso, Washington, D.C., were on the brief for appellee.

Before PRYOR, Chief Judge, FERREN, Associate Judge, and YEAGLEY, Associate Judge, Retired.

YEAGLEY, Associate Judge, Retired:

■ Appellee is charged with one count each of corrupt influence (D.C.Code § 22–704 (1981)) and sodomy (D.C.Code § 22–3502 (1981)), and two counts of obstruction of justice (D.C.Code § 22–703 (1981)). On October 28, 1981, a jury trial commenced before Superior Court Judge Eugene N. Hamilton, but ended in a mistrial two days later and was set over for motions as a result of the government's attempt during the second day of trial to introduce tape recordings of conversations between appellee and the complaining witness, Lois Frontuto. On December 29 and 30, 1981, Judge Hamilton conducted a hearing on appellee's motion to suppress tape recordings.[1] Judge Hamilton suppressed the recordings, having found that Frontuto involuntarily consented to the recording of her conversations with appellee. The government appealed.

This court reversed and remanded the case to have Judge Hamilton detail what standard he applied in assessing Frontuto's consent. The judge, after articulating the standard he used, again suppressed the recordings based on an involuntary consent, holding that the police exerted substantial pressure to overcome Frontuto's will.

The government appeals, asserting that although the standard is correct as expressed, the trial judge's conclusion is clearly wrong. Appellee argues that even if Frontuto consented voluntarily, admission of the recordings into evidence is illegal under the District of Columbia wiretap statute and unconstitutional under the Fourth Amendment of the United States Constitution. We reverse.

I

The relevant facts are as follows. Sometime prior to October 7, 1980, policeman Paul Abshire spoke with Sergeant Arnold Nicholson of the District of Columbia Metropolitan Police Department's Internal Affairs Division (IAD). He informed Nicholson that Frontuto, a career prostitute, complained to him that appellee, a policeman, compelled her to sodomize him.[2] Then, on October 7, 1980, although Frontuto had not filed a formal complaint, Nicholson and IAD Sergeant Stanley Organ drove to her home in Landover, Maryland, to question her about the allegation she made to Abshire. Nicholson testified that Frontuto said she did not want to talk about the

1. The hearing ended December 31, 1981, after Frontuto failed to appear for resumption of cross-examination. We reject appellee's contention that he was unconstitutionally denied his confrontation rights when the cross-examination was prematurely closed. Appellee failed to make an objection on those grounds to the trial court. Instead, when Frontuto failed to appear to conclude her cross-examination, counsel stated, "the defense is willing to submit on what is already filed, and would just ask the court to consider the weight of the evidence before the court. And rule accordingly on the motion to suppress which is presently before the court." It is untenable for appellee to argue that he was denied the opportunity to cross-examine Frontuto when clearly his counsel made the tactical decision to ask the trial court to terminate the hearing and infer from Frontuto's absence an unwillingness to cooperate, rather than risk eliciting adverse testimony during further cross-examination. Since we find no violation, we do not agree with appellee that Frontuto's testimony should not be considered on the issue of her consent to the taping of her conversations with appellee.

2. At trial, Frontuto testified that early in the morning of September 30, 1980, appellee discovered her in a parking lot with two customers, whom she had just sodomized, and a second prostitute, who was acting as a look-out; that appellee checked identification and then told everyone except Frontuto to leave; and that she asked appellee not to arrest her because she had a case pending. At this juncture, trial was recessed for the evening. The next morning, October 29, 1981, Frontuto took the stand to give further testimony about her complaint, *i.e.*, that appellee had her sodomize him as an alternative to arrest, but was excused without testifying after the following had transpired. In anticipation of Frontuto's testimony regarding conversations between herself and appellee, the government began setting up a tape recorder to play recordings of those conversations. The trial judge questioned the admissibility of the recordings. As a result, Frontuto was excused and the next government witness was called.

incident until she talked with Larry (a.k.a. "Moose"), her common-law husband. Nicholson stated that when he then asked her to attempt to identify from a photograph array containing appellee's picture the policeman allegedly involved in the incident, she chose someone else's picture. Frontuto testified that she quickly gathered up the photographs, picked one, and told the officers to leave her house. She explained at trial that she told them to leave because she did not want her children, who were home, to know about the incident, and that she was reluctant at that time to discuss it with IAD because she did not know what effect it would have on an unrelated prostitution charge pending against her.[3]

Three days later, on October 10, 1980, Nicholson and Organ returned to Frontuto's home. Frontuto testified that the sergeants explained that they had to investigate the complaint which was now in their hands and that they requested her to accompany them to their District of Columbia office or call them at her convenience. She agreed at that time to go to their office. Once there, Frontuto gave her statement of the alleged incident between herself and appellee.

Nicholson and Organ had no other contact with Frontuto until February 20, 1981, when they saw her in the 14th Street and Thomas Circle, N.W. area. According to Nicholson, Frontuto told him that on two recent occasions she talked with appellee.[4] Nicholson also testified that although he was aware that Frontuto frequented the Thomas Circle area, he did not go there looking for her.

On March 4, 1981, Nicholson and Organ again visited Frontuto at her home, asking her to go with them to IAD to talk to the lieutenant. Frontuto testified that she agreed to go and that, once there, she agreed to participate in the investigation by arranging to meet with appellee and by attending the meeting.

After discussing the "plan" with the IAD officers, Frontuto executed two "One Party Consensual Recording" forms authorizing Nicholson and Organ to record her conversations with appellee. At trial, Frontuto stated that she was given the choice whether or not to participate in the tape recording; that no one tried to influence her choice, either through threats of retribution if she would not consent, or promises of benefit if she would; and that she did not believe she was in custody, under arrest, or about to be charged with any crime.

From an IAD office Frontuto called appellee at work, but unable to reach him, she left a message and the telephone number at IAD. Pursuant to Frontuto's authorization, Nicholson and Organ recorded appellee's return call to Frontuto in which they arranged a meeting, and the meeting itself. These recorded conversations, the subjects of the suppression order, were the culmination of the IAD's investigation of appellee.

## II

We are, for the first time, called upon to construe D.C.Code § 23–542(b)(2) (1981), the one-party consent provision of the District of Columbia wiretap statute.[5] We begin by observing that that section expressly permits the police to intercept a wire or oral communication after securing the consent of a party to the conversation,[6]

---

3. Four times during the period relevant to this case Frontuto was arrested and charged with solicitation: October 3 and 22, 1980; March 7, 1981; and July 23, 1981. The October cases were disposed of on November 3, 1980. The first by a guilty plea, and the other by a *nolle prosequi*. The third case was disposed of on March 31, 1981, by a guilty plea. The July case was disposed of on October 1, 1981, by a finding of guilt.

4. Frontuto testified that the first time appellee spoke with her he told her to tell IAD that her statement was a lie, and that the next time they spoke, he threatened to arrest her for prostitution because she had not recanted her statement.

5. D.C.Code §§ 23–541, –556 (1981).

6. Section 23–542(b)(2) reads:

and that D.C.Code § 23–553(b) (1981) expressly sanctions testimonial disclosure "of the contents of any wire or oral communication intercepted in accordance with this subchapter...." *United States v. Bishton*, 150 U.S.App.D.C. 51, 56, 463 F.2d 887, 892 (1972) (construing 18 U.S.C. §§ 2511(2)(c) and 2517(3) of the federal wiretap statute, which is "virtually identical" to the District of Columbia statute, *Khaalis v. United States*, 408 A.2d 313, 341 (D.C.1979) (construing District of Columbia wiretap statute's standing provision)), *cert. denied*, 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980).[7] Under D.C. Code § 23–542(b)(2), for an interception to be "in accordance with" the statute, and, hence, admissible against the nonconsenting party, the one-party consent must have been given voluntarily.[8] *United States v. Brandon*, 633 F.2d 773, 776 (9th Cir.1980) (construing 18 U.S.C. § 2511(2)(c), federal analogue to D.C.Code § 23–542(b)(2) (1981)).

 Before reviewing the trial judge's conclusion that Frontuto did not consent freely, we must determine whether he assessed her voluntariness under the correct standard. We again turn to federal authority. In *United States v. Bonanno*, 487 F.2d 654, 658 (2d Cir.1973), when the Second Circuit formulated its consent standard, it began by noting that to show con-

sent to the monitoring and recording of one's communications, the amount of proof required "is normally quite different" from that needed to prove consent to a physical search. This is so, the court explained, because consent to a physical search involves doing something apparently contrary to self-interest, whereas consent to the interception, as an incident to cooperation with the police, ordinarily entails no unpleasant consequences. The court then described the consent test in interception cases as "easy," having concluded that "it will normally suffice for the government to show that the informer went ahead with a call after knowing what the law enforcement officers were about." *Id.* at 658–59. In *United States v. Hodge*, 539 F.2d 898 (6th Cir.), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1976), the Sixth Circuit held that "to establish involuntariness the defendant's burden is to show that [the informant's] will was overcome by threats or improper inducement amounting to coercion or duress...." *Id.* at 904 (quoting *United States v. Silva*, 449 F.2d 145, 146 (1st Cir.1971), *cert. denied*, 405 U.S. 918, 92 S.Ct. 942, 30 L.Ed.2d 787 (1972)). We hold that the government meets its burden by showing that the consenting party cooperated "knowing what the law enforcement officers were about."

---

(b) It shall not be unlawful under this section for—

 * * * * * *

(2) a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception....

7. 18 U.S.C. § 2511(2)(c) reads:

 (c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2517(3) reads:

 (3) Any person who has received, by any means authorized by this chapter, any infor-

mation concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

8. Hence, we reject appellee's contention that the recordings' admission into evidence would violate the District of Columbia wiretap statute regardless of whether Frontuto's consent was voluntarily given. We also reject appellee's contention that the warrantless interception of these conversations based on a one-party consent violated the Fourth Amendment. Indeed, the law is well-settled that it does not. *See United States v. Horton*, 601 F.2d 319, 320–21 (7th Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979).

*Bonanno, supra,* 487 F.2d at 659. The defendant then, in order to suppress the evidence, must prove the existence of improper inducement or coercive threats.[9]

The trial judge ruled that:

For the purpose of showing voluntary consent, it is only necessary for the government to show initially that one party to a communication engaged in a communication knowing that that communication was being monitored by government agents. Such a showing would be sufficient to permit the testimonial use of such communications, unless the party objecting to their use shows by a preponderance of the evidence that the will of the party so engaged in the communication was overcome by threats or improper inducement amounting to coercion or duress.

We conclude that the trial judge applied the correct standard and turn, finally, to review his ultimate conclusion.

### III

■ Our scope of review is limited to determining whether the trial court's finding was "plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (1981). We will reverse such a finding if it is "without substantial support in the evidence." *Peoples v. United States,* 395 A.2d 41, 44, *cert. denied,* 442 U.S. 911, 99 S.Ct. 2826, 61 L.Ed.2d 277 (1978); *Russell v. United States,* 348 A.2d 299, 301 (D.C. 1975); *United States v. McNeil,* 140 U.S. App.D.C. 3, 6, 433 F.2d 1109, 1112 (1969).

The trial judge concluded that the police, determined to wear down Frontuto until she agreed to cooperate, ignored her desire to be left alone and exploited her vulnerability as a prostitute. In his opinion, "Frontuto had no desire to even talk to Sergeant Nicholson." The trial judge pointed out that Frontuto "made it clear"

to the police that she did not want them coming to her house and that their "mere presence in her home required her to give difficult explanations to not only her children, but also to Larry." The trial judge was bothered that the police initiated all contact with Frontuto and that they never announced their visits with her. He concluded that if the police "really intended not to coerce Ms. Frontuto, they could have written or [telephoned] her" prior to visiting. Given all that, the trial judge determined that Frontuto's assent was the product of a sustained and successful effort by the police to force Frontuto to acquiesce in their investigation.

■ For several reasons we conclude that the trial judge's assessment is without substantial support in the record and must be reversed. To begin with, when the trial judge concluded that "[t]his is not a case of a person initiating some contacts [with] the police," he erred since he ignored that Frontuto sought out Officer Abshire to complain about appellee's alleged conduct. Apparently having second thoughts about pursuing her complaint, Frontuto later was unwilling to discuss her allegation with Officers Nicholson and Organ on their first visit and was anxious to have them leave her home. It is not true, however, that her reluctance persisted throughout. She testified that on October 7, 1980, she did not want to discuss it "at that time," leaving open the possibility that she would discuss it with IAD after she spoke with Larry. On their second visit three days later, Nicholson and Organ gave Frontuto the option of going with them to their office or calling them at a more convenient time. If Frontuto truly desired to be left alone, she could have turned away the officers rather than agree, as she did, to go to IAD and file a formal complaint which she must have

---

9. We adopt the view held in several federal circuits that one's will is not overborne simply because the government offers benefits in exchange for cooperation; nor is the consent vitiated because the government, in order to secure cooperation, calls to an accused's attention "a realistic description of [his] predicament created by his violation of the criminal law...." *Brandon, supra,* 633 F.2d at 777; *see Horton, supra,* 601 F.2d at 322–23 and cases cited therein; *Hodge, supra,* 539 F.2d at 904–05.

known would get her "involved." Finally, rather than continue to resist involvement as the trial judge suggested, Frontuto, on February 20, 1981, actually furthered the investigation—she reported to Nicholson and Organ that since they last met, appellee had approached her twice.

There is also no significant record support for the proposition that Frontuto took these steps because she was vulnerable—either because she was trying to hide her involvement from Larry or because she had cases pending against her. Frontuto had indicated from the start that she wished to discuss it with Larry. That she had told Larry about the incident by October 10, 1980, is supported by her testimony that he was at home with her when the police arrived and she agreed to go to IAD to file a complaint. Although Frontuto did have a case pending at that time, it and a subsequent charge of October 22, 1980, were disposed of on November 3, 1980. From then until her arrest on March 7, 1981, days after she agreed to have her conversations with appellee recorded, Frontuto had no other cases in the system. Appellee suggests that Frontuto was vulnerable on March 4, 1981, since although she admitted committing several acts of sodomy on September 30, 1980, the police failed to offer her immunity or advise her of her rights.[10] There is simply no evidence that the police tried to secure Frontuto's cooperation by threatening prosecution. As we noted earlier, *supra* at note 9, consent is not necessarily vitiated by the possibility of penalties. *See Horton, supra,* 601 F.2d at 322.

It is clear from the record that Frontuto voluntarily agreed to the tape recordings knowing what the police were about and willingly participated therein. The record does not reflect that any improper inducement or coercive threats were visited upon Frontuto. Consequently, we conclude that the trial court's finding was plainly wrong. The grant of the motion to suppress must be reversed.

Accordingly, the judgement on appeal is *Reversed.*

---

10. Sometime after March 4, 1981, the government granted Frontuto transactional immunity for her crimes in sodomizing appellee and her customer.