**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Walter Douglas EMMERT,**
**Defendant/Appellant.**

**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Richard Gail ARRIAGA,**
**Defendant/Appellant.**

**Nos. 85–5231, 85–5232.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1986.

Decided Oct. 2, 1987.

Michael J. McCabe, San Diego, Cal., for defendant/appellant Emmert.

Jonathan B. Jordan, San Diego, Cal., for defendant/appellant Arriaga.

Elizabeth A. Hartwig, San Diego, Cal., for plaintiff/appellee.

Before ALARCON, BRUNETTI and NOONAN, Circuit Judges.

BRUNETTI, Circuit Judge:

Walter Douglas Emmert and Richard Gail Arriaga appeal their convictions arising out of a cocaine transaction which involved government informants and agents. Emmert was convicted on two counts of possession of cocaine with intent to distribute (21 U.S.C. § 841(a)(1)), one count of conspiracy (21 U.S.C. §§ 846 and 841(a)(1)), and four counts of using a telephone to further a narcotics transaction (21 U.S.C. § 843(b)). Arriaga was convicted of possession and conspiracy. Both defendants claimed that the trial court erroneously excluded certain testimony of a co-conspirator as hearsay or as irrelevant to their entrapment defense. They also argue that the government's conduct in the investigation of this case constitutes a violation of their due process rights. We reject these claims and affirm the convictions.

## BACKGROUND

Walter Douglas ("Doug") Emmert was 28 years old, an undergraduate at the University of California, San Diego, pursuing a double major in biology and psychology. He became involved in the drug transaction after his friend and roommate Thomas Powell told him about a $200,000 finder's fee offered by Martin Mosteller, a confidential government informant, for locating a substantial supply of cocaine. Mosteller told Powell that he had a buyer for the

cocaine in the Detroit area. This "buyer" was Narcotics Task Force undercover agent Joseph Vasquez.

Mosteller first approached Powell to find a cocaine supplier because he believed Powell attended a party at which cocaine was used. After several inquiries by Mosteller about a supplier of commercial quantities of cocaine, Powell introduced Emmert to Mosteller as a person who might know of someone that could help find a supplier. At this meeting, Mosteller offered Powell and Emmert a $200,000 "finder's fee" for introducing him to someone who could sell him forty kilograms of cocaine. Powell later informed Mosteller that he and Emmert were incapable of putting together the proposed drug transaction.

Mosteller arranged a July 24, 1984 meeting between Vasquez and Powell. Powell demanded a $200,000 finder's fee for putting together the transaction. He further demanded that the cash be placed in a safe deposit box which could only be opened with Powell's signature. This was to constitute a "life insurance policy" for Powell and Emmert.

The next day, Powell and Mosteller again met with Vasquez, who was introduced to Emmert. Emmert gave Vasquez a sample of cocaine, quoted a price, and discussed other details of a proposed forty kilogram transaction.

During the first half of August, 1984, Powell and Emmert met with Mosteller, Vasquez, Sherry Ackermann (another undercover agent acting as Vasquez's girlfriend), and Powell's purported suppliers, Dave Emery and Mario Cioe. During these meetings, the "buyers" displayed $100,000 in "flash" money and Emmert, Emery, and Cioe provided additional cocaine samples, stating that it was representative of forty kilograms they had for sale. During these meetings, Powell and Emmert again requested that the $200,000 finder's fee be placed in a safe deposit box accessible only with Powell's signature. The next day, Powell met with Mosteller and Ackermann at a San Diego bank to deposit the money in a safe deposit box. Because both Mosteller and Ackermann signed their names on the account, the box could be opened without Powell's signature, thwarting his "life insurance" plan.

The parties failed to complete the transaction. On August 15, 1984, Emmert and Emery met with Vasquez and Ackermann. Emery wanted $40,000 up front and aired his concern that Vasquez might be a policeman. The agents then expressed anger that they had money ready to buy the cocaine, but that the sellers were unable to consummate the sale. Vasquez testified that he told Emery "Maybe we'll do the deal in an airplane and if something goes wrong, we'd have one parachute and guess who'd come down without one." Ackermann told Emmert that she had three words for Powell, "R.I.P." The next day, Vasquez told Emmert on the telephone that Vasquez was losing credibility with his associates because of his inability to buy the drugs as planned and that he was returning to Detroit.

Emmert and Powell had no more contact with Vasquez or other agents until September 20, 1984. During this hiatus, however, Mosteller spoke with Powell and tried to put the cocaine deal back together. On September 6, Mosteller threatened Powell that he and Emmert had one week to make the sale they previously discussed "or else." Mosteller did not make good on his threat and negotiations between the parties continued.

Finally, the parties arranged and executed the sale. On October 23 Vasquez met Emmert and Mario Cioe in a parking lot. Another undercover agent produced money and Cioe counted it. One of Cioe's men, Hyatt, then delivered an envelope of cocaine to Vasquez. Appellant Arriaga, who had not previously been involved in negotiations or other meetings between the parties, delivered more cocaine. The agents immediately arrested Emmert and Cioe, and captured Arriaga after a brief chase. Police arrested Powell several days later.

After his arrest, Emmert implicated Powell and said that he thought Vasquez was with the "mob." Arriaga, whose name had never come up in the negotiations, explained that he had been paid $100 to deliver the cocaine.

At the trial, the defense presented an entrapment theory, and characterized the government agents as intimidating individuals who represented themselves as members of a Detroit Mafia crime family. Powell, who pled guilty to one count of using the telephone in a narcotics transaction, testified that he and Emmert were afraid after meeting Vasquez and felt compelled to complete the sale. Emmert gave similar testimony. Emmert's brother and cousin testified that Emmert told them that he was being forced into a drug deal by the Mafia, and was very afraid. The jury was instructed on entrapment and rejected the defense.

Emmert contends on appeal that the trial court erred in excluding Powell's testimony that, during the hiatus between the August 16 meeting and Vasquez's September 20 telephone call to Emmert, Mosteller threatened Powell to proceed with the transaction. The district court excluded the testimony as tending to raise a "derivative entrapment" issue because Mosteller did not communicate the threats directly to Emmert. Emmert contends that, for purposes of entrapment, Powell was a mere conduit for the transmission of Mosteller's threats to Emmert. (Appellant Arriaga essentially adopted Emmert's appellate issues and arguments without explaining how the exclusion of this testimony affects his conviction.) Appellants Emmert and Arriaga also maintain that the government's conduct in the investigation of this case is so outrageous so as to deprive them of their due process rights. We reject these arguments and affirm.

## EXCLUSION OF POWELL'S TESTIMONY

### A. Threats from Informant

■ The defense sought to introduce Powell's testimony recounting threats made to Powell in Emmert's absence. The district court excluded the testimony as tending to raise the "derivative entrapment" defense, which has been rejected in this circuit. *See e.g. United States v. North,* 746 F.2d 627, 630 (9th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985). Appellants contend on appeal that the exclusion of this evidence related to their entrapment defense deprives them of due process.[1] We reverse evidentiary rulings for an abuse of discretion, *United States v. McClintock,* 748 F.2d 1278, 1291 (9th Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985), only if that non-constitutional error would have been more likely than not to affect the verdict. *United States v. Owens,* 789 F.2d 750, 757 (9th Cir.1986); *United States v. Soulard,* 730 F.2d 1292, 1296 (9th Cir.1984).

■ The entrapment defense is only available to defendants who were directly induced by government agents. *United States v. North,* 746 F.2d 627 (9th Cir. 1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985). The *North* rule clearly precludes appellant Arriaga from complaining of the exclusion of Powell's testimony since the government agents had no contact with him or even knowledge of him until he delivered the cocaine. Appellant Emmert insists that Powell was merely a "conduit" for the agent's efforts to entrap him because Mosteller made representations, inducements and threats to Powell which Mosteller intended Powell to pass on to Emmert so that Emmert would complete the narcotics transaction. Inducement by a private party is not entrapment. *United States v. Cruz,* 783 F.2d 1470 (9th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 2902, 90 L.Ed.2d

---

1. We note that, under federal law, entrapment is not a constitutional defense. *United States v. Russell,* 411 U.S. 423, 430–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973) (outrageous government conduct, but not mere entrapment, may violate due process). Rather, it is a court-created limitation on governmental activity. *Ainsworth v. Reed,* 542 F.2d 243, 244 (5th Cir. 1976), *reh'g. denied,* 544 F.2d 518, *cert. denied,* 439 U.S. 917, 97 S.Ct. 1332, 51 L.Ed.2d 596 (1977). The doctrine is "rooted ... in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them *by the Government."* *Russell,* 411 U.S. at 435, 93 S.Ct. at 1644 (emphasis added).

987 (1986). Thus, Emmert can establish entrapment by his "conduit" theory only if Powell was a government agent at the time of the alleged inducement. *United States v. Busby*, 780 F.2d 804, 806 (9th Cir.1986). We hold that he was not.

■ Appellants contend that this case is different than the "derivative entrapment" cases because the government agents specifically intended that Powell communicate threats to Emmert, making Powell an "unwitting agent" of the government. We have previously stated that an approach to a defendant by a private citizen before he was cooperating with the government, did not constitute governmental solicitation or inducement for purposes of the entrapment defense. *United States v. Brandon*, 633 F.2d 773, 778 n. 5 (9th Cir.1980). In *Brandon*, Bracelin became acquainted with Yarbrough, a DEA agent who posed as an international drug dealer. After Bracelin refused Yarbrough's offer to enter into drug transactions, DEA agents arrested Bracelin and promised to recommend to the prosecutor to be lenient in exchange for a meeting with Brandon to consummate a drug transaction under electronic surveillance. This court summarily rejected the notion that the government entrapped Brandon through Bracelin before Bracelin's arrest. Bracelin had no knowledge that Yarbrough was a government agent before his arrest, and, as a private citizen, approaching Brandon at that time did not constitute government solicitation or inducement. *Id.* Powell, like Mr. Bracelin in the *Brandon* case, did not know that the people with whom he was dealing were agents of the government until after he was arrested. Under these circumstances, *Brandon* requires that we reject the "conduit" theory.

In *Busby*, one Cowen had previously worked for state and federal government agencies as a paid informant. Unsupervised and undirected by the government, Cowen arranged a drug sale with Busby. After the terms of the sale were negotiated, Cowen contacted the police who provided an undercover agent to pose as Cowen's financial backer. We held that Cowen's previous status as a paid informant and his expectation that he would be paid for providing more information about the defendant in that case did not establish an agency relationship with the government. We concluded that, even though Cowen had an ongoing relationship with law enforcement agencies, that relationship was not sufficient to constitute an "agency" for conduct unsupervised by the police. 780 F.2d at 807. Thus, the initial negotiations between Cowen and Busby did not constitute entrapment. *Id.* Powell's relationship with Mosteller and Vasquez to provide a willing cocaine vendor not knowing that these "buyers" were really government agents was much more removed from an "agency" than was Cowen's relationship. Thus, under the *Busby* rationale, Powell was not a government agent.

Finally, the record establishes that Powell acted as a principal lawbreaker, and not as an agent of law enforcement, in inducing appellants to engage in the drug transaction. *See United States v. Freedson*, 608 F.2d 739, 740–41 (9th Cir.1979). Powell was himself a target of the undercover investigation, not a third party enlisted unwittingly or otherwise to "ensnare" the appellants. Because Emmert's "conduit" theory is merely an attempt to introduce the rejected derivative entrapment defense, the district court properly found that Powell's proferred testimony is irrelevant and did not abuse its discretion in excluding it.

B. *Emmert's Hearsay Statements*

The district court also excluded Powell's testimony that Emmert told him that he was afraid of the government agents. The court ruled that such testimony was hearsay not excepted by Federal Rule of Evidence 803(3), which provides that the hearsay rule does not exclude:

(3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), *but not including a statement of mem-*

*ory or belief to prove the fact remembered or believed ...*

("limiting language" emphasized). The district court ruled that Rule 803(3) did not except Powell's testimony from the hearsay rule because it was "a statement of memory or belief to prove the fact remembered or believed...." While we review evidentiary rulings for an abuse of discretion, *United States v. McClintock, supra,* the district court's construction of the rules of evidence is reviewed de novo. *United States v. Owens,* 789 F.2d 750, 757 (9th Cir.1986).

This court has identified three factors bearing on the "foundational inquiry on admissibility" under Rule 803(3): contemporaneousness, chance for reflection, and relevance. *United States v. Ponticelli,* 622 F.2d 985, 991 (9th Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980), overruled on other grounds, *United States v. De Bright,* 730 F.2d 1255, 1259 (9th Cir.1984). Defendants contend that the district court erred by failing to apply this analysis. We disagree. The court focused not on the foundation requirements of the state of mind exception, but assumed arguendo that the testimony met the general Rule 803(3) requirements. The court then properly focused on the memory-or-belief limitation on Rule 803(3).

Appellants contend that *United States v. Kelly,* 722 F.2d 873 (1st Cir.1983), *cert. denied,* 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984), construed the limiting language in Rule 803(3). *Kelly* merely concluded that the trial court properly admitted testimony as to the defendant's declarations tending to show state of mind in a criminal prosecution which required proof of state of mind. 722 F.2d at 878. The decision does not discuss the language limiting the scope of Rule 803(3).

■ *United States v. Cohen,* 631 F.2d 1223 (5th Cir.1980), *reh'g denied,* 636 F.2d 315 (1981), is factually similar to this case. It also specifically addresses the "limiting language" in Rule 803(3). In *Cohen,* witnesses were called by the defense to corroborate the defendant's direct testimony of threats made by Galkin, a co-conspira-

tor. The witnesses would have testified as to Cohen's out-of-court declarations that he was threatened. The Fifth Circuit upheld the exclusion of this evidence:

> Appellant seeks to stretch the limited scope of admissibility under F.R.E. 803(3). That rule by its own terms excepts from the ban on hearsay such statements as might have been made by Cohen of his then existing state of mind or emotion, *but expressly excludes from the operation of the rule a statement of belief to prove the fact believed....* [T]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. *If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition— "I'm scared"—and not belief—"I'm scared because Galkin threatened me."*

631 F.2d at 1225 (emphasis added). Because the reasoning in *Cohen* is compelled by the limiting language of Rule 803(3), we adopt it and apply it to this case. Powell was to testify that Emmert declared that he was scared because of the threats made by the agents, who Emmert thought were members of a crime family. Since Powell's testimony would have fallen within the "belief" category and would not have been limited to Emmert's current state of mind, it was properly excluded.

## OUTRAGEOUS GOVERNMENT CONDUCT

Finally, defendants argue that the government's role in the drug transaction was objectively so outrageous as to have violated their right to due process of law. The court, after trial and a post-trial hearing, denied their motion to dismiss the indictment on this ground. We review the denial of their motion to dismiss de novo as a question of law, *United States v. Bogart,* 783 F.2d 1428, 1431 (9th Cir.1986), while viewing the evidence in the light most favorable to the government and accepting

the court's factual findings unless clearly erroneous. *United States v. Bagnariol,* 665 F.2d 877, 880 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).

The Supreme Court recognized the defense of outrageous governmental conduct in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), and *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). This Court recently analyzed the defense in *United States v. Bogart, supra. Bogart* limits the availability of the defense to extreme cases and compels an affirmance in this case.

At the outset, we note that Arriaga lacks standing to object to the government's activities in this case since he was never an actual target of the investigation. *Bogart,* 783 F.2d at 1433. Emmert was not initially a target of the government's investigation, but became a target when Powell introduced him to Mosteller and Vasquez.

There are two categories of cases in which law enforcement conduct becomes constitutionally unacceptable: (1) the government utilizes unwarranted physical or mental coercion to effectuate the crime; or (2) the police completely fabricate the crime solely to secure the defendant's conviction. *Bogart,* 783 F.2d at 1438. Appellants argue both theories.

### A. *Mental Coercion*

Emmert contends that government agents coerced him to proceed with the drug transaction with threats and intimidation and, further weaves into his argument that by offering a $200,000 finder's fee for relatively little work, and because Powell and Emmert had never bought or sold drugs previously, the government conduct was outrageous. We turn first to the threats.

The trial court found that there was no independent evidence of coercive threats.[2] Such a finding is consistent with the jury finding that Emmert was not entrapped because of the same threats and intimidation. The court's finding of fact is not clearly erroneous.

■ The same threats by government agents may theoretically be the basis for both an entrapment defense and a due process claim for unwarranted mental coercion, however, the standards for the two defenses are different. In *Bogart* we noted the distinction between a due-process claim for outrageous government conduct, which is determined objectively, and the subjective entrapment defense. 783 F.2d at 1435. Furthermore, the standard for a due process claim is much higher than the standard for a statutory entrapment defense. *See Bogart,* 783 F.2d at 1435 (due process defense must not swallow up the entrapment rule).

■ Express or implied threats may be warranted under certain circumstances. In *United States v. Reynoso-Ulloa,* 548 F.2d 1329, 1339 (9th Cir.1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978), this Court rejected a due process defense based on alleged threats by a government informant in a drug deal. We noted that threats must be viewed in their context and may not always constitute outrageous conduct:

> The threat must be viewed in the context of the vulgarity and 'puffing' engaged in by all participants in the transaction.... This Court may judicially notice the fact that trafficking in drugs is a sordid business, and often involves persons of the

**2.** The trial court held a post-conviction hearing on this contention and concluded that there was no evidence of coercive threats independent from Powell's and Emmert's testimony. The court had the benefit of the trial testimony as well as Mosteller's testimony. There were clear discrepancies between what Powell and Emmert testified to and the testimony of Vasquez, Mosteller, and government undercover agent Sherry Ackermann. There were also differences as to what the agents meant and what the conspirators said that they understood them to mean.

The court concluded that many contacts had been made with Powell and Emmert at the initiative of the government agents, Vasquez and Mosteller, but that the testimony it accepted as credible—that of Vasquez and Powell, plus the taped telephone conversations between Vasquez and Emmert and between Vasquez and Powell—showed at the most "extremely weak threats." In sum, although threats were made, they were not coercive.

lowest caliber. When viewed in this context, [the government informant's] threat fails to rise to the level of conduct violative of 'fundamental fairness, shocking to the universal sense of justice.' *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960).

548 F.2d at 1339. Because threats of the kind found here—scarcely more than bluster—are ordinary bargaining tactics in drug deals, government agents may need to engage in such unsavory conduct to maintain their cover. Indeed, in this case, agent Vasquez had to allay Emmert's and Emery's suspicions that he was a police officer. The threats convinced Emmert that Vasquez was a "mobster" with whom he could do business.

We also reject the argument that the amount of the finder's fee offered Emmert and Powell renders the government's conduct outrageous. Like the intimidation, large sums of money are common to narcotics enterprises and necessary to create a credible cover for undercover agents. Furthermore, Mosteller's offer of the large finder's fee was not intended as bait for college students, but as a method to smoke out a supplier capable of selling large quantities of cocaine.

Finally, we address Emmert's contention that selecting Powell and Emmert makes the investigation outrageous. Even though Mosteller did not know whether Powell was a drug dealer, he knew Powell was probably in a position to know someone who was by virtue of attending a party where cocaine was served. Under these circumstances, asking Powell whether he knows a drug supplier is not outrageous. Emmert did not become a target of the investigation until he voluntarily accepted Powell's invitation to meet with Mosteller. At that first meeting between Emmert and Mosteller, Powell introduced Emmert as someone who could arrange a drug sale. Targeting Emmert was thus the result of Powell's and Emmert's own voluntary conduct, and was not outrageous.

For these reasons, the criminal investigation in this case, including the threats, intimidation, large finder's fee, and targeting of Powell and Emmert for investigation, does not constitute mentally coercive outrageous government conduct that "shocks the conscience." *Russell*, 411 U.S. at 432, 93 S.Ct. at 1643.

### B. *Fabrication of Crime*

Defendants also claim that the government agents entirely fabricated the drug transaction. They cite the district court's finding that there was no evidence that Emmert or Powell had been involved in prior drug transactions. As we noted in *Bogart,* the inquiry into the defendants' predisposition to commit the crime is relevant to the subjective entrapment defense. When evaluating the merits of a due process claim, however, courts should consider the government's conduct objectively, without regard to the defendants' predisposition. 783 F.2d at 1433.

Government agents may approach people already engaged in or contemplating criminal activity. *United States v. O'Conner*, 737 F.2d 814, 817–18 (9th Cir.1984), *cert. denied*, 469 U.S. 1218, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985). In the course of an undercover narcotics investigation, an agent may provide something of value to a criminal enterprise to gain the confidence of those involved in illicit activity. *United States v. Lomas*, 706 F.2d 886, 890–91 (9th Cir.1983). Emmert was drawn into this conspiracy by Powell. When the government agents first targeted Emmert for investigation, he had expressed interest in receiving a portion of the finder's fee in exchange for brokering cocaine supplied by Cioe. He was therefore contemplating criminal activity and further investigation was appropriate.

Law enforcement conduct becomes constitutionally unacceptable "where government agents engineer and direct the criminal enterprise from start to finish." *United States v. So*, 755 F.2d 1350, 1353 (9th Cir.1985); *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983). Generation of new crimes merely for the sake of pressing criminal charges against the defendant also constitutes outrageous government conduct. *Ramirez*, 710 F.2d at 540. The *Bogart* decision points out that due process claims under this theory have been successful only where the "government essentially

manufactured the crime." 783 F.2d 1436 (discussing *Greene v. United States,* 454 F.2d 783 (9th Cir.1971); *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978); *United States v. Batres-Santolino,* 521 F.Supp. 744 (N.D.Cal.1981)).

This case is fundamentally different than *Greene v. United States,* 454 F.2d 783 (9th Cir.1971). In that case, the government essentially manufactured the crime. An undercover agent was involved in the defendant's illegal still operation for two years. The agent offered to supply raw materials, an operator and location for the still. The government actually sold sugar to the defendants at wholesale prices. The agent also purchased the still's entire production. This court concluded that the government could not involve itself so directly and continuously for such a long period of time and then prosecute its "collaborators." 454 F.2d at 787. In this case, the government was on only one side of the transaction: Powell and Emmert independently arranged the cocaine supply from co-defendant Cioe. The government did not fabricate the crime in this case.

AFFIRMED.