Opinion by Judge NOONAN; Dissent by Judge N.R. SMITH.
OPINION
NOONAN, Circuit Judge:
Yvon Wagner, as the personal representative of the estate of her brother, Eric Vogel, appeals the judgment of the district court in favor of the defendants, County of Maricopa and Joseph Arpaio. We reverse the judgment and remand for a new trial.
FACTS
Eric Vogel was born on December 21, 1964. By the age of six, he was showing signs of potential illness. His parents withdrew him from school when he was in the second grade, and he was thereafter home-schooled until he graduated from high school. He attended a community college for two semesters and part of a semester at Arizona State University. Thereafter, he simply lived at home.
Living at home, without further formal education, Vogel had no gainful employment and lived a remarkably restricted life. The windows of his home itself were covered with blankets and tape so that no one could see in. After his father’s death or departure, he lived alone with his mother. He left the home no more than two or three times to attend the funerals of relatives. In October 2001, when Vogel was 36, his sister, Yvon Wagner, visited the home and found him to be delusional, imagining that a snake was around his neck.
On the morning of November 12, 2001, for no apparent reason, Vogel left his home. Police responded to a report of a burglar in the neighborhood and spotted Vogel as a possible suspect. The first officer on the scene struggled to get control of him while Vogel shouted, “Kill me.” When a second officer arrived, Vogel stated that he, Vogel, must see the president. The police said they would accommodate him. He calmed down and they drove him to the Phoenix jail.
In Arizona, common jails are kept by the sheriff of the county. Ariz.Rev.Stat. § 31-101. Joseph Arpaio, as the sheriff of Maricopa County, kept the jail to which Vogel was brought.
*979 Vogel was put under arrest for assaulting a police officer. He completed a medical questionnaire, indicating that he had high blood pressure but no other health problems. A classification counselor interviewed him and placed a psychiatric hold on him. A psychological counselor examined him and concluded that he needed psychiatric care.
He was put in an isolation cell with a huge window opening the cell to the view of the jailers and to inmates. The next morning, November 13, Vogel was assessed by a psychological counselor as disoriented, paranoid, and psychotic. He told her that he was at the World Trade Center getting messages from satellites. She obtained an order for his transfer to the inpatient psychiatric unit at the jail.
That afternoon, Vogel was informed that he must “dress-out.” In the argot of the jail, “to dress-out” was to change from one’s civilian clothes to prison garb approved by Sheriff Arpaio. The prison outfit included pink underwear. Vogel declined to change.
The “dress-out” prison officer summoned assistance — four other officers, each to hold an arm or a leg while Vogel’s clothes were changed. He was placed on the ground, stripped of all his clothes, and forced into the jail ensemble including the pink underwear. As the process went on, he shouted that he was being raped. The officers were aware that he was being transferred to the Psychiatric Unit. At the end of the “dress-out” Vogel was wheeled there in “a restraint chair.”
Vogel received treatment for a week and was then bailed out by his mother. On December 6, 2001, he was in his mother’s car when she had a minor traffic accident. He was told that there was a warrant for his arrest for spitting on an officer during the dress-out, so he might be returned to jail. Hearing that the police were coming, he ran four or five miles from the car. He died the next day. The cause, according to the Maricopa County Medical Examiner, was acute cardiac arrhythmia.
PROCEEDINGS
December 6, 2002, Vogel’s mother as representative of his estate began this action in Arizona Superior Court. It was removed by the defendants to the federal district court, which eventually returned the case to the state court. The plaintiff amended to assert a claim against the defendants for violation of 42 U.S.C. § 1983 by subjecting Vogel to an unreasonable search and seizure and denying due process and the equal protection of the laws. A claim was also asserted under the Americans with Disability Act, 42 U.S.C. § 12131, et seq., and the Rehabilitation Act of 1973, 29 U.S.C. § 794, as well as several claims under Arizona law. The case was transferred back to the federal district court.
In limine, the district court ruled that Vogel’s mother and sister could not testify to what he told them about events at the jail. The court also ruled that counsel could not refer to “pink underwear” unless he could show that the record contained “credible evidence” that Vogel was aware of the color of the underwear. The court also precluded the testimony of the plaintiffs expert Dr. Spitz that Vogel’s death was in part caused by the “dress-out.” The court also limited the testimony of Dr. Esplín.
Before trial began, Vogel’s mother died and his sister Yvon Wagner replaced her as the representative of the estate.
At the close of the trial, the court denied plaintiffs counsel the opportunity to make a rebuttal.
*980 The jury returned a verdict for the defendants on each count. This appeal followed.
DISCUSSION
We review evidentiary rulings for abuse of discretion and reverse if the exercise of discretion is both erroneous and prejudicial. As Judge Smith points out, it is not entirely clear whether construction of a hearsay rule is a matter of discretion or a legal issue subject to de novo review. Compare United States v. Stinson, 647 F.3d 1196, 1210-11 (9th Cir.2011), with United States v. Ortega, 203 F.3d 675, 682 (9th Cir.2000). We need not resolve the ambiguity here because our conclusions would be the same under either standard. We begin with the ruling limiting the testimony of Yvon Wagner.
Wagner in her deposition stated:
He [her brother] felt he was being raped. He felt one of the officers attempted to put his penis in his mouth and that he had to keep his mouth so tight that he bruised his outer lips to avoid being accosted that way.
He was sure they were going to rape him. He hollered to people. He was sure that all the inmates heard him saying who he was and that he was being raped and please help him. And they were, you know, have [sic] a party at his expense....
He believed he had been raped. He believed somebody took their penis out of their pants and attempted to insert it in his mouth. And that’s as close to— my brother was a virgin. He — 36 years old, never touched another woman. This was very, I’m sure, frightening for him.
In response to the motion in limine, Wagner made the same argument she makes now. She argued that her statements were
not being offered to prove the details of the incident at the jail. Her testimony is not to prove an actual rape, but instead to show her brother’s state of mind following his incarceration. Her testimony establishes] the impact that the event had on Eric. Yvon can testify as to the statements he made, his tone of voice, and his state of mind in making them.
Federal Rule of Evidence 803(3) excepts from the hearsay rule “statements] of the declarant’s then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed[.]”
Indisputably, Wagner could have testified at trial about the impact the jail incident had on Vogel, how his mood was following the incident, how disturbed he seemed, and even what he thought happened to him during the incident, all without putting inadmissible hearsay before the jury. None of this testimony would have been put forth in order to establish the truth of what he had said. Wagner proposed to testify about how extremely delusional Vogel was following the incident, and more importantly, the emotional impact the incident had on him, including how humiliated he now felt by the pink underwear. She was not asserting the truth of anything that Vogel said had happened to him in jail.
Her testimony was admissible not to prove “the fact remembered or believed” but the “mental feeling” of Vogel. We have, as our dissenting colleague points out, stated that the limiting language of Rule 803(3) bars “ ‘statements as to why [the declarant] held the particular state of *981 mind, or what he might have believed that would have induced the state of mind.’” United States v. Emmert, 829 F.2d 805, 810 (9th Cir.1987) (quoting United States v. Cohen, 631 F.2d 1223, 1225 (5th Cir.1980)). But our application of that language makes clear that the bar applies only when the statements are offered to prove the truth of the fact underlying the memory or belief. In Emmert, for example, the defendant sought to introduce his out of court statement that “he was scared because of the threats made by the agents.” 829 F.2d at 810. Emmert was also interested in proving the underlying facts: that “the government agents [were] intimidating individuals who represented themselves as members of a Detroit Mafia crime family.” Id. at 808.
Here, Vogel’s statements to his sister were offered to establish his state of mind, not that he was raped — which was undisputedly false — or that he went through the dress-out procedure — which was undisputedly true. Moreover, they were offered to show his state of mind at the time of the conversation, thus satisfying any contemporaneity requirement. See United States v. Ponticelli, 622 F.2d 985, 991 (9th Cir.1980), overruled on other grounds by United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc). Exclusion of this evidence was erroneous and fatally prejudicial.
The defense argument that Wagner lacked personal knowledge is mistaken. She had personal knowledge of how Vogel had been impacted by the incident. She testified as a percipient of what she had observed.
The court curtailed Yvon Wagner’s testimony further by not permitting her to testify to Vogel’s conversation with her where he gave his sense of humiliation at being forced to wear pink underwear or his sense of having been subjected to a rape. The court banned any testimony mentioning “rape” or “gang rape” unless counsel showed that the terms were not “unduly prejudicial.” As already noted, the court excluded reference to the color of the clothes put on Vogel unless there was credible evidence that “Vogel was aware of the color of the jail-issued underwear.”
The rulings as to “rape” and “gang rape” misconceived any testimony Wagner would have offered. She would have used the words to show her brother’s present state of mind, not his past experience.
As to testimony of Vogel’s perception of the color, Wagner’s testimony was to the current state of her brother’s mind when he spoke to her. His mind was focused on the implications of being dressed in pink. That he had been dressed in pink was not a delusion. But what was essential to the plaintiffs case was Wagner’s testimony that the shock and humiliation of the “dress-out” in pink was preying on his mind. The court’s suppression of any reference to pink underwear was an abuse of discretion. The ruling delivered a second blow to the plaintiffs case.
When a color of such symbolic significance is selected for jail underwear, it is difficult to believe that the choice of color was random. The County offers no penological reason, indeed no explanation whatsoever for its jail’s odd choice. Given the cultural context, it is a fair inference that the color is chosen to symbolize a loss of masculine identity and power, to stigmatize the male prisoners as feminine.
That Vogel was delusional does not mean that he was incapable of seeing. If you pricked him, he bled. Just as his eyes saw the pink, so his mind made the association of the color. So at least a jury could infer from the impact of the dress-out on Vogel apparent from his conversation with his sister.
*982 Medical experts. Wagner presented Daniel Spitz, the chief medical examiner of Macomb County, Michigan, a county embracing southern Detroit. In his deposition Spitz had stated that he had conducted thousands of autopsies; that he had examined three to five cases where schizophrenia in relation to cardiac arrhythmia was the cause of death; and that there was forensic and psychiatric literature on the connection between schizophrenia and cardiac arrhythmia. He gave the opinion that the sudden and unexpected death of Vogel was due to cardiac arrhythmia intensified by an increase in schizophrenia and that that increase in schizophrenia was “likely” due to Vogel’s recollection of his treatment at the jail and his fear of returning to it.
The disti’ict court held that he failed to meet the qualifications for an expert set by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). His testimony was excluded entirely.
The defense does not deny the foundation of Spitz’s opinion. Its Reply Brief states: “No one disputes the general proposition that persons with severe schizophrenia have an increased incidence of the kind of arrhythmia that killed Vogel. Everyone agrees that Vogel’s underlying mental illness was the factor that induced the cardiac arrhythmia.” The defendants deny that anyone could determine what caused the particular increase in the arrhythmia that killed Vogel.
The purpose of expert testimony is to “assist the trier of fact to understand the evidence or to determine a fact in issue” by providing opinions on “scientific, technical, or other specialized knowledge[.]” Fed.R.Evid. 702 (2008). To guard against the risk that jurors will accept an expert’s testimony simply because he or she is an expert, a district court must ensure that all expert testimony is “not only relevant, but reliable.” Daubert, 509 U.S. at 589, 113 S.Ct. 2786 (1993); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that Daubert applies to “all expert testimony”). The test for reliability is flexible and depends on the discipline involved. See Kumho, 526 U.S. at 150, 119 S.Ct. 1167. “[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.” Id. at 142, 119 S.Ct. 1167.
The district court’s decision to exclude Dr. Spitz’s opinion that the dress-out procedure was “probably” the cause of Vogel’s death was a reasonable application of Daubert. The opinion was not supported by the typical Daubert factors — testing, peer review and general acceptance. Dr. Spitz did not explain, for example, how the generally accepted facts (1) that the incidence of cardiac arrhythmia is disproportionately high among schizophrenics and (2) that stress can render the condition fatal allowed him to determine the specific event that triggered Vogel’s death. Nor did he explain how having seen four or five cases of fatal cardiac arrhythmia in schizophrenics helped him reach his conclusion.
Generally accepted facts and experience might lead a medical expert to reliably opine (as Dr. Ehrlich did) that the dress-out procedure could have been a triggering stressor. Although Dr. Spitz’s and Dr. Ehrlich’s opinions are similar in that respect, Dr. Spitz went farther and offered an opinion as to an actual cause. It is this leap that dispositively distinguishes the two experts.
The plaintiff also offered the testimony of Phillip Esplín, a Phoenix psychologist. Esplín had originally been proposed as a witness by the County and had prepared a *983 report as required by Fed.R.Civ.P. 26(a)(2). Taking his deposition, Wagner found his testimony favorable to her position and sought him as a witness at trial. The district court permitted only the submittal of his report and excluded his live testimony.
In both of its rulings the district court pointed out the dependence of the two proposed experts on Wagner’s reported conversations with her brother. As the district court excluded Wagner’s testimony as to the conversations, so it found that the experts could not base their opinions upon Wagner’s accounts.
As we have already indicated, the exclusion of testimony showing Vogel’s state of mind was both error and prejudicial to the plaintiff. It was equally error and prejudicial to exclude the experts’ opinions based on that testimony.
Argument to the Jury. The district court abruptly eliminated the plaintiffs opportunity for rebuttal argument. No good reason was given for this disappointment of the plaintiffs legitimate expectation. If the court intends to restrict rebuttal, the litigants should be so advised prior to the argument.
Counsel for the county engaged in argument suggesting that the jury consider comparative fault. Comparative fault is not a defense here.
Issues on remand. The parties have not raised the question of whether the dress-out procedure is in every case a violation of due process when applied to persons convicted of no crime. Unpleasant physical measures — e.g., a strip search — may be necessary to secure the safety of an institution even though they impinge on the dignity of innocent inmates. Bull v. City and County of San Francisco, 595 F.3d 964 (9th Cir.2010) (en banc). As the Supreme Court has explained:
if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to “punishment.” Conversely, if a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.
Bell v. Wolfish, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citations omitted). Unexplained and undefended, the dress-out in pink appears to be punishment without legal justification.
It appears to us that this question is still open for exploration at trial on remand. Alternatively, the plaintiff may prevail on the narrower proposition that to apply this procedure automatically to a man known by his jailors to be in need of psychiatric treatment was itself a violation of due process. Because of the evidentiary rulings of the trial court neither issue was presented to the jury.
REVERSED and REMANDED.