**MICROSOFT CORPORATION,**
**Plaintiff,**

v.

**MOTOROLA, INC., et al., Defendants.**

**Motorola Mobility, Inc.,**
**et al., Plaintiffs,**

v.

**Microsoft Corporation, Defendant.**

**Case No. C10–1823JLR.**

United States District Court,
W.D. Washington,
at Seattle.

Oct. 22, 2012.

---

Theodore W. Chandler, Sidley Austin, Los Angeles, CA, Arthur W. Harrigan, Jr., Shane P. Cramer, Calfo Harrigan Leyh & Eakes, LLP, Seattle, WA, Brian R. Nester, Carter G. Phillips, Sidley Austin, Washington, DC, Christopher T. Wion, Calfo Harrigan Leyh & Eakes, LLP, Seattle, WA, Constantine L. Trela, Jr., David C. Giardina, David Greenfield, David T Pritikin, Douglas I. Lewis, Ellen S. Robbins, John W McBride, Nathaniel C. Love, Richard A. Cederoth, William H. Baumgartner, Jr., Sidley Austin, Chicago, IL, David E. Killough, T. Andrew Culbert, Microsoft Corp., Redmond, WA, for Microsoft Corp.

Douglas H Hallward-Driemeier, Paul M. Schoenhard, Amanda Wieker, Ropes & Gray, Washington, DC, Gabrielle Elizabeth Higgins, Mark D. Rowland, Norman H. Beamer, James R. Batchelder, Ropes & Gray LLP, East Palo Alto, CA, Jesse J. Jenner, Steven Pepe, Kevin J. Post, Josef B. Schenker, Khue V. Hoang, Laurence S. Rogers, Conor Brew McDonough, Stuart W. Yothers, Ropes & Gray LLP, New York, NY, Philip S. McCune, Ralph H. Palumbo, Summit Law Group, Seattle, WA, Andrea Pallios Roberts, Brian C. Cannon, Quinn Emanuel Urquhart Oliver & Hedges, Redwood Shores, CA, Kathleen M Sullivan, Quinn Emanuel Urquhart Oliver & Hedges, New York, NY, William C. Price, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA, Samuel Lawrence Brenner, Ropes & Gray, Boston, MA, for General Instrument Corporation, Motorola Mobility LLC, and Motorola, Inc.

## ORDER

JAMES L. ROBART, District Judge.

### I. INTRODUCTION

Microsoft Corporation ("Microsoft") moves to exclude testimony of Charles R. Donohoe and Dr. R. Sukumar. (Microsoft Mot. (Dkt. # 396).) Mr. Donohoe is an expert who offers his opinion as to a reasonable and non discriminatory ("RAND") royalty for Defendants Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation's (collectively, "Motorola"). Dr. Sukumar conducted a survey on behalf of Motorola regarding "usage and valuation of certain features offered in Microsoft's Xbox 360 console," namely H.264 and 802.11 capability. Motorola moves to

exclude testimony of Microsoft's experts doctors Kevin M. Murphy, Matthew R. Lynde, and Timothy S. Simcoe related to determining RAND terms through the "lens" of an *ex ante,* multilateral (rather than bilateral) negotiation. (Motorola Mot. (Dkt. # 393).) Having considered the motions, as well as all papers filed in support and in opposition, and the governing law, and having heard oral argument on October 18, 2012, the court DENIES both Microsoft's and Motorola's motions.

## II. BACKGROUND

### A. Standard Setting Organizations

Microsoft and Motorola are both members of the Institute of Electrical and Electronics Engineers ("IEEE") and the International Telecommunication Union ("ITU"). The IEEE and the ITU, neither of which are parties to the instant dispute, are international standards setting organizations. Standards setting organizations play a significant role in the technology market by allowing companies to agree on common technological standards so that all compliant products will work together. Standards lower costs by increasing product manufacturing volume, and they increase price competition by eliminating "switching costs" for consumers who desire to switch from products manufactured by one firm to those manufactured by another.

One complication with standards is that it may be necessary to use patented technology in order to practice them. If a patent claims technology selected by a standards setting organization, the patent is called an "essential patent." Here, Motorola is the owner of numerous patents "essential" to certain standards established by the IEEE and the ITU. (*See* 10/21/10 Motorola Offer Ltr. (Dkt. # 79–5); 10/29/10 Motorola Offer Ltr. (Dkt. # 79–6) (see list of attachments).) In order to reduce the likelihood that owners of essential patents will abuse their market power, many standards setting organizations, including the IEEE and the ITU, have adopted rules related to the disclosure and licensing of essential patents. The policies often require or encourage members of the standards setting organization to identify patents that are essential to a proposed standard and to agree to license their essential patents on RAND terms to anyone who requests a license. Such rules help to ensure that standards do not allow essential patent owners to extort their competitors or prevent them from entering the marketplace.

### B. Motorola's Statements to the IEEE and the ITU

This lawsuit involves two standards—the IEEE 802.11 wireless local area network ("WLAN") Standard ("802.11 Standard") and the ITU H.264 advanced video coding technology standard ("H.264 Standard").[1] (*See generally* Compl. (Dkt. # 1); Am. Compl. (Dkt. # 53).) The IEEE's standard setting process is governed by its Intellectual Property Rights Policy (the "IEEE Policy"). (*See generally* IEEE Policy (Dkt. # 79–1).) The IEEE Policy provides that "IEEE standards may be drafted in terms that include the use of Essential Patent Claims." (*Id.* at 18 (Section 6.2).) The IEEE Policy defines the term "Essential Patent Claim" as one or more claims in an issued patent (or pending patent application) that are "necessary to create a compliant implementation of either mandatory or optional portions of

---

1. The ITU developed the H.264 Standard jointly with two other standard setting organizations—the International Organization for Standardization and the International Electrotechnical Commission. (Partial S.J. Order, 854 F.Supp.2d 993, 995 (W.D.Wash.2012).)

the normative clauses of the [Proposed] IEEE Standard . . . ." (*Id.*)

If the IEEE learns that an IEEE standard or a proposed IEEE standard may require the use of an essential patent claim, the IEEE requires the patent holder to either state that it is not aware of any patents relevant to the IEEE standard or to provide the IEEE with a Letter of Assurance. (*Id.*) Any such Letter of Assurance must include either (1) a disclaimer to the effect that the patent holder will not enforce the "Essential Patent Claims," or (2):

> [a] statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination. . . .

(*Id.*) If the IEEE cannot obtain a Letter of Assurance, it refers the essential patent to the IEEE Patent Committee. (*Id.*)

Motorola has submitted numerous Letters of Assurance to the IEEE in connection with the 802.11 Standard stating that it "will grant" or "is prepared to grant" a license under RAND terms for its patents essential to the 802.11 Standard. (*See generally* IEEE LOAs (Dkt. # 79–2).) A typical Motorola Letter of Assurance to the IEEE provides, in relevant part:

> The Patent Holder will grant [or is prepared to grant] a license under reasonable rates to an unrestricted number of applicants on a worldwide, non-discriminatory basis with reasonable terms and conditions to comply with the [Proposed] IEEE Standard.

(*See generally id.*) Such Letters of Assurance are irrevocable once submitted

and accepted by the IEEE and apply from the date the standard is approved until the date the standard is withdrawn. (IEEE Policy at 19.)

Like the IEEE, the ITU has established a policy (the "ITU Policy") with respect to holders of patents "essential" to implementing a standard. (*See* ITU Policy (Dkt. # 79–3).) Such patent holders must file with the ITU a "Patent Statement and Licensing Declaration" declaring whether they (1) will grant licenses free of charge on a RAND basis; (2) will grant licenses on RAND terms; or (3) are not willing to comply with either of the first two options. (*See id.* at 9–12.) If a patent holder is not willing to comply with either of the first two options, the ITU standard will not depend on that patent(s). (*Id.* at 9.)

Motorola has sent numerous declarations to the ITU stating that they will grant licenses on RAND terms for its patents essential the H.264 Standard. (*See generally* ITU Declarations (Dkt. # 79–4).) A typical declaration by Motorola to the ITU provides, in relevant part:

> The Patent Holder will grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to use the patented material necessary in order to manufacture, use, and/or sell implementations of the above ITU–T Recommendation ISOC/IEC International Standard.[2]

(*E.g., id.* at 2.)

## C. Motorola's Offer Letters to Microsoft

On October 21, 2010, Motorola sent Microsoft a letter (the "October 21 Letter") that read in pertinent part:

> concerned and are performed outside the ITU–T ISO/IEC." (ITU Declarations at 2.)

---

**2.** The declaration to the ITU also states that "negotiations of licenses are left to the parties

This letter is to confirm Motorola's offer to grant Microsoft a worldwide non-exclusive license under Motorola's portfolio of patents and pending applications having claims that may be or become Essential Patent Claims (as defined in section 6.1 of the IEEE bylaws) for a compliant implementation of the IEEE 802.11 Standards.... Motorola offers to license the patents under reasonable and non-discriminatory terms and conditions ("RAND"), including a reasonable royalty of 2.25% per unit for each 802.11 compliant product, subject to a grant back license under the 802.11 essential patents of Microsoft. As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e.g., each Xbox 360 product) and not on component software (e.g., Windows Mobile Software).

(10/21/10 Offer Ltr. at 2.) Then, on October 29, 2010, Motorola sent a similar letter (the "October 29 Letter") regarding the H.264–related patents, stating:

Motorola offers to license the patents on a non-discriminatory basis on reasonable terms and conditions ("RAND"), including a reasonable royalty, of 2.25% per unit for each H.264 compliant product, subject to a grant back license under the H.264 patents of Microsoft, and subject to any Motorola commitments made to JVT in connection with an approved H.264 recommendation. As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e.g., each Xbox 360 product, each PC/laptop, each smartphone, etc.) and not on component software (e.g., Xbox 360 system software, Windows 7 software, Windows Phone 7 software, etc.)

(10/29/10 Offer Ltr. at 2.) Motorola attached to its October 29 Letter a non-exhaustive list of patents it offered to license to Microsoft. (*See id.*)

On November 9, 2010, Microsoft filed its complaint initiating this action, and on February 23, 2011, Microsoft filed an amended complaint. (Compl.(Dkt. # 1); Am. Compl. (Dkt. # 53).) Microsoft contends that the October 21 and October 29 Letters seek unreasonable royalty rates and therefore breach Motorola's obligations to the IEEE and the ITU to grant licenses on RAND terms. (Am. Compl. at 21, 22.) Microsoft alleges claims against Motorola for breach of contract and promissory estoppel.[3] (*Id.*) In its prayer for relief, Microsoft seeks, *inter alia,* (1) a declaration that it is entitled to a license on RAND terms from Motorola for all patents subject to Motorola's commitments to the IEEE (through Letters of Assurance) and to the ITU (through declarations), and (2) a judicial accounting of a RAND royalty rate for Motorola's patents subject to these commitments. (*Id.* at 25 (Prayer for Relief).)

In response, Motorola asserted affirmative defenses and counterclaims. (*See* Motorola Answer (Dkt. # 68).) Motorola's counterclaims, which are relevant to the instant motion for preliminary injunction, seek a declaratory judgment that (1) Motorola has not breached any RAND obligations, and (2) Microsoft repudiated and/or rejected the benefits of Motorola's RAND obligations, and therefore Microsoft is not entitled to a license to Motorola's patents related to the H.264 and 802.11 Standards. (*Id.* ¶¶ 61–75 (Counterclaims).)

---

3. Microsoft's action against Motorola also included claims for waiver and declaratory judgment, but the court's June 1, 2011 order dismissed both of those claims, leaving only the breach of contract and promissory estoppel claims. (Dkt. # 66 at 12.)

## D. The November 13, 2012 Trial

In three prior orders,[4] the court ruled that Motorola's Letters of Assurance to the IEEE and Motorola's declarations to the ITU create enforceable contracts between Motorola and the respective standard setting organization to license its essential patents on RAND terms. Additionally, the court found that as a member of the IEEE and the ITU and a prospective user of both the H.264 Standard and the 802.11 Standard, Microsoft is a third-party beneficiary of the contract. (*Id.*)

With the parties' input, the court adopted a two-part approach to adjudicate Microsoft's breach of contract claim.[5] The court will first determine a RAND royalty rate (or RAND royalty range) at the November 13, 2012 trial, and second, with this determination as guidance, a jury will hear Microsoft's breach of contract claim. In advance of the November 13, 2012 trial, the parties each submitted *Daubert* motions regarding expert testimony related to the proper methodology for adjudication of a RAND royalty rate. The court now addresses the issues raised by the parties' respective *Daubert* motions.

## III. LEGAL STANDARD

■ Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). When considering expert testimony offered pursuant to Federal Rule of Evidence 702, the trial court acts as a "gatekeeper" by "making a preliminary determination that the expert's testimony is reliable." *Elsayed Mukhtar v. Cal. State Univ., Hayward,* 299 F.3d 1053, 1063 (9th Cir.2002). *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147–48, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Daubert,* 509 U.S. at 589–90, 113 S.Ct. 2786. An expert witness may provide opinion testimony if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, (2) the testimony is based upon sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the expert has reliably applied the principles and methods to the facts of the case. Fed.R.Evid. 702; *see Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F.3d 1356, 1360 (Fed.Cir. 2008). In *Daubert* the Supreme Court set forth a nonexclusive list of factors to determine whether scientific testimony is sufficiently reliable: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether it is generally accepted in the scientific community. *Wagner v. Cnty. of Maricopa,* 673 F.3d 977, 989 (9th Cir.2012) (quoting *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786).

"[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Pri-*

---

4. *See* 2/27/12 Order, 854 F.Supp.2d at 999; 6/6/12 Order, 864 F.Supp.2d 1023, 1032(W.D.Wash.2012); 10/10/12 Order, 2012 WL 4827743 (W.D.Wash.).

5. This case has a complex procedural history, and while the court will not recite it in this order, the procedural background of this case can be found in the court's October 10, 2012 order on Motorola's motion for partial summary judgment (10/10/12 Order at 8–11).

*miano v. Cook,* 598 F.3d 558, 564 (9th Cir.2010) (citing *Daubert,* 509 U.S. at 594, 596, 113 S.Ct. 2786). The inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* Therefore, trial courts can and should consider other factors not specifically mentioned by the United States Supreme Court in *Daubert. Daubert,* 509 U.S. at 594, 113 S.Ct. 2786. "Under *Daubert,* the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert,* the expert may testify and the jury decides how much weight to give that testimony." *Id.* (quoting *United States v. Sandoval–Mendoza,* 472 F.3d 645, 654 (9th Cir.2006)).

"Trial courts must exercise reasonable discretion in evaluating and in determining how to evaluate the relevance and reliability of expert opinion testimony." *United States v. Alatorre,* 222 F.3d 1098, 1102–03 (9th Cir.2000). A trial judge has "considerable leeway" in deciding not only "how to go about determining whether particular expert testimony is reliable," but also in deciding whether the testimony is reliable. *Kumho Tire,* 526 U.S. at 153, 119 S.Ct. 1167.

## IV. ANALYSIS

### A. Microsoft's *Daubert* Motion

#### 1. Charles R. Donohoe

Microsoft moves to exclude the expert testimony of Charles Donohoe, Motorola's expert who opines as to the proper method for determining a RAND royalty rate. (Microsoft Mot. at 12.) Mr. Donohoe determined a RAND royalty range by using a modified *Georgia–Pacific* methodology: Mr. Donohoe's approach began with a 2.25% royalty of Microsoft's end product price, and then adjusted this royalty up or down based on Mr. Donohoe's analysis of each of the 15 *Georgia–Pacific* factors. (*See generally* Donohoe Decl. (Dkt. # 399–2).) The *Georgia–Pacific* methodology—also known as the "the 'willing licensor-willing licensee' approach"—is a common approach to determining a reasonable royalty in the context of patent infringement. *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324 (Fed.Cir.2009) (quoting *Georgia–Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970)). This approach determines a reasonable royalty "on the basis of a hypothetical negotiation, occurring between the parties at the time that infringement began" using the 15 *Georgia–Pacific* factors to guide that hypothetical negotiation. *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1312 (Fed.Cir.2011). The first of the *Georgia–Pacific* factors is: The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty. *Georgia–Pacific,* 318 F.Supp. at 1120. Mr. Donohoe claims that his initial 2.25% royalty rate is based on existing Motorola license agreements involving (1) licenses to Motorola's entire 802.11 and/or H.264 standard essential patent portfolios in addition to Motorola's cellular portfolios; (2) licenses to Motorola's cellular portfolio that include one or more 802.11 standard essential patents; and (3) licenses that include a grant to only Motorola's 802.11 and H.264 standard essential patent portfolios. (Donohoe Decl. ¶¶ 64–91.) In other words, Mr. Donohoe looked to past/existing Motorola license agreements involving some or all of Motorola's 802.11 and H.264 standard essential patents in an effort to determine an established royalty rate and then analyzed the remaining *Georgia–Pacific* factors to modify the initial rate.

■ Microsoft does not challenge Mr. Donohoe's use of the *Georgia–Pacific* factors. Instead, Microsoft moves to exclude Mr. Donohoe's testimony because he (1) selected an inappropriate beginning royalty rate by relying on non-comparable Motorola license agreements, and (2) failed to properly account for the value of Motorola's 802.11 and H.264 standard essential patents. Microsoft also argues that Mr. Donohoe's RAND royalty analysis is unreliable because it does not account for the entire market value rule, and is therefore contrary to law. (*See generally* Microsoft Mot.) For the reasons set forth below, the court finds that Microsoft's first two arguments go to the weight of Mr. Donohoe's testimony, as opposed to its admissibility; and, with respect to Microsoft's assertion that the entire market value rule ("EMVR") precludes Mr. Donohoe's testimony, the court, while skeptical of Motorola's position, declines to make such a determination at this time.

As an initial matter, the court finds that Mr. Donohoe's methodology of beginning with an initial royalty rate and then analyzing the *Georgia–Pacific* to reconstruct a hypothetical negotiation has thoroughly "been subjected to peer review and publication." The Federal Circuit, as the appellate court for patent-related issues, has consistently sanctioned the use of the *Georgia–Pacific* factors "to frame the reasonable royalty inquiry." *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 60 n. 2 (Fed.Cir.2012). Moreover, other courts have spoken to the applicability of the *Georgia–Pacific* factors in determining a reasonable royalty in the RAND context. *See Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 314–15 n. 8 (3d Cir.2007) ("The reasonableness of royalties is an inquiry that courts routinely undertake using the 15–factor test set forth in *Georgia–Pacific* ... *and some courts have already applied this test in the [RAND]*

*context.*") (emphasis added). Consistent with legal opinions, scholarly publications also speak to the extension of the *Georgia–Pacific* factors to the determination of a RAND royalty rate in the context of licensing standard essential patents. (Brenner Decl. (Dkt. # 406) Ex. 55 (Anne Layne–Farrar, *Be My FRAND: Standard Setting and Fair, Reasonable and Non-discriminatory Terms* ) at 5 ("One obvious option for providing context to [RAND] within [standard setting organizations] would be to extend the *Georgia–Pacific* fifteen factors to standard setting. In fact, the majority of these factors are already directly applicable to [RAND] evaluations in a standard setting context.").) Thus, the court finds that Mr. Donohoe's methodology is reliable under *Daubert* because it has been subjected to peer review and publication and cited approvingly.

Nevertheless, citing *Uniloc,* Microsoft asserts that Mr. Donohoe's initial 2.25% royalty rate is untethered from the facts of this case. *Uniloc,* 632 F.3d at 1315 ("If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded."). Additionally, Microsoft argues that basing a 2.25% starting point on past Motorola license agreements involving Motorola's standard essential patents for cellular telephone networks does not support a 2.25% starting point in this case because entirely different standards are at issue here, namely the H.264 and 802.11 standards. (Microsoft Mot. at 12–13.) For purposes of the *Daubert* motion, the court disagrees. Certainly, the applicability of Motorola's license agreements, which Mr. Donohoe examines in determining the initial royalty rate of 2.25%, should be subject to vigorous cross examination with respect to their comparability to the present case. But each license agreement cited by Mr. Donohoe involves at least one of Motorola's 802.11 or H.264 standard essen-

tial patents, and two of those involve only Motorola's 802.11 and H.264 standard essential patent portfolios. Further, in at least one instance, Motorola has received a royalty rate similar to the 2.25% starting rate for a license to its H.264 and 802.11 standard essential patent portfolio. Thus, the cited license agreements provide at least some indicia of the appropriate initial royalty rate such that the court cannot say the initial rate is so divorced from the facts of this case as to render Mr. Donohoe's testimony inadmissible. *See Inventio Ag v. Otis Elevator Co.*, No. 06 Civ. 5377, 2011 WL 3359705, at *3 (S.D.N.Y. June 22, 2011) (finding that expert's starting point, selected because it was the rate patentee at one time licensed its intellectual property, was not untied to the facts of the case so as to warrant exclusion, but instead the propriety of the starting point went to the weight as opposed to admissibility). Accordingly, the court declines to exclude Mr. Donohoe's otherwise admissible testimony on the grounds that it is contrary to *Uniloc.*

Next, Microsoft argues that Mr. Donohoe's analysis impermissibly focuses on the value of 802.11 and H.264 standards and not on the value of Motorola's own standard essential patents. Thus, according to Microsoft, Mr. Donohoe's analysis captures the hold-up value—the value that exists after patents have been declared essential to a standard. (Microsoft Mot. at 17–22 (citing *Apple, Inc. v. Motorola, Inc.*, 869 F.Supp.2d 901, 913 (N.D.Ill.2012)).) Microsoft contends that capturing such hold-up value is contrary to the law. *(Id.)* Again, for purposes of the *Daubert* motion, the court disagrees, and finds that Microsoft's criticism of Mr. Donohoe's analysis go to weight as opposed to admissibility.

Contrary to Microsoft's assertion, in his report, Mr. Donohoe expressly considered the opinions of technical professionals in assessing the value of Motorola's 802.11 and H.264 patents to the standards themselves. (Donohoe Decl. ¶¶ 132, 138.) From these technical professionals, Mr. Donohoe understood Motorola's standards to include core aspects of both the 802.11 and H.264 standards. *(Id.)* Thus, to the extent that Mr. Donohoe discusses the importance of the standards in his *Georgia–Pacific* analysis, such discussion implicitly considers the importance of Motorola's standard essential patent portfolios. Here, it appears Microsoft's dispute is with the opinions of Motorola's technical professionals who found Motorola's 802.11 and H.264 patent portfolios fundamental to the respective standards. Such a dispute is factual in nature and will not act to exclude admissible expert testimony.[6]

██ Finally, Microsoft asserts that Mr. Donohoe's testimony fails to account for the entire market value rule. (Microsoft Mot. at 22–23.) In the context of patent infringement, the entire market value rule allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the "basis for customer demand" or "substantially create[s] the value of the component parts." *Lucent Techs.*, 580 F.3d at 1336; *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549–50 (Fed.Cir.1995). Accordingly, Microsoft contends that Mr. Donohoe's application of the 2.25% royalty to the entire market value of Microsoft's products is contrary to law because Mr. Donohue does not attempt to satisfy the predicate that Motorola's standard essential patents create the basis for customer

---

6. Indeed, Microsoft's *Daubert* motion does not seek to exclude or attack the appropriateness of Motorola's technical professionals, and therefore no basis exists to exclude their opinions (upon which Mr. Donohoe relied).

demand of Microsoft's products. (Microsoft Mot. at 23.)

■ On the face of the rule, it would be appear Mr. Donohoe has improperly applied the 2.25% royalty rate to Microsoft's end product price without first demonstrating that Motorola's standard essential patents create the basis for the customer demand of Microsoft's products. But, in *Lucent Technologies, Inc. v. Gateway, Inc.*, the Federal Circuit examined the entire market value rule and found that it did not act as a *per se* bar to application of a royalty rate to end product price without showing that the patent creates the basis for the customer demand:

> Although our law states certain mandatory conditions for applying the entire market value rule, courts must nevertheless be cognizant of a fundamental relationship between the entire market value rule and the calculation of a running royalty damages award. Simply put, *the base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range (as determined by the evidence).* Indeed, [a]ll running royalties have at least two variables: the royalty base and the royalty rate.
>
> \* \* \* \* \* \*
>
> *There is nothing inherently wrong with using the market value of the entire product, especially when there is no established market value for the infringing component or feature,* so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature.

580 F.3d 1301, 1338–39 (Fed.Cir.2009) (emphases added) (internal quotations omitted). In other words, the royalty rate and the base are simply variables to be deter-mined based on the evidence presented and in accord with proper apportionment regarding the value of the patented feature. Consistent with the statements in *Gateway*, district courts have permitted license agreements based on the entire product value as evidence of a reasonable royalty rate despite a lack of showing that the patented feature formed the "basis for customer demand." *See, e.g., The Boeing Co. v. United States*, 86 Fed. Cl. 303, 319–20 (2009); *Mondis Tech., Ltd. v. LG Elecs., Inc.*, 2011 WL 2417367, at \*3 (E.D.Tex. June 14, 2011). Thus, the court declines to adopt a *per se* rule that a royalty rate may never be applied to the entire product price without satisfaction of the entire market value rule.

With that said, the court has already expressed skepticism that an appropriate RAND royalty rate for Motorola's standard essential patents should be based on the end product price of Microsoft's products. By their very nature, Motorola's standard essential patents only relate to the 802.11 and H.264 capabilities, which in turn only constitute a portion of Microsoft's end products. It would thus seem illogical to turn around and base a RAND royalty on the end product price. Nevertheless, as the court cannot say Mr. Donohoe's testimony violates the entire market value rule, the court will not currently exclude Mr. Donohoe's testimony, which is otherwise based on a reliable methodology.

### 2. Dr. Sukumar

Microsoft moves to exclude Dr. R. Sukumar's survey, which Dr. Sukumar conducted on behalf of Motorola with the purpose of understanding usage and valuation of certain features offered in Microsoft's Xbox 360 console. (Sukumar Rpt. (Dkt. # 398–1) at 4.) Specifically, Dr. Sukumar's survey focused on the H.264 video decoding and the 802.11 Wi–Fi capabilities of the

Xbox 360. (*Id.*) Dr. Sukumar's survey employed a "conjoint analysis," which is described below:

> In conjoint analysis, we determine what value a customer places on a particular feature of a product by measuring the partial value ("partworth" utility) of multiple individual features of the product. For example, we measure the value to the customer of the product offered in several combinations, some of which might contain feature 1 (but perhaps not feature 2), some of which might contain feature 2 (but perhaps not feature 1), and some of which might contain both features 1 and 2. We can use the data we collect to isolate the value to the customer of one particular feature.

(*Id.* ¶ 2.)

Microsoft seeks to exclude Dr. Sukumar's survey on the grounds that (1) it is unreliable because the questionnaire used incomprehensible terminology, such as asking respondents to "select the types of video content [he or she] has viewed on his or her Xbox console and providing options of "MBAFF (Macroblock Adaptive Frame/Field)," "Progressive," and "not sure," and (2) it used a non-representative sample of the relevant universe, that is, Xbox owners, users, or individuals likely to purchase an Xbox. (Microsoft Mot. at 24–25.) Additionally, Microsoft asserts that Dr. Sukumar's survey is unreliable because it failed to provide a margin of error for his calculations.

 Microsoft's criticisms of Mr. Sukumar's survey "go to 'issues of methodology, survey design, reliability, ... [and] critique of conclusions,' and therefore 'go to the weight of the survey rather than its admissibility.'" *Fortune Dynamic v. Victoria's Secret Stores Brand Management, Inc.,* 618 F.3d 1025, 1038 (9th Cir.2010) (quoting *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1263 (9th Cir.

2001)). "[T]echnical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Id.* (internal quotation marks omitted). First, Microsoft's assertion that Dr. Sukumar used a non-representative sample does not appear well-founded. Microsoft suggests that the relevant universe is Xbox owners, users, or individuals likely to purchase an Xbox. Dr. Sukumar's survey only surveyed Xbox owners. But, any argument as to under-inclusiveness of the survey goes to weight, as opposed to admissibility. *Id.* Second, although Microsoft may dispute the clarity of Dr. Sukumar's questionnaire, the disputed questionnaire terms were themselves defined in the survey and given to respondents who owned an Xbox, and were arguably more likely to understand technical terms. Thus, the clarity of the survey questionnaire is a question of fact, best resolved at trial through cross examination. Third, contrary to Microsoft's assertion, Dr. Sukumar's survey did in fact contain a margin for error calculation. (Sukumar Rpt. at 8 ("Statistical confidence intervals can be expected to be within a range of 3.5%–5.2% at a 95% confidence level.").)

Here, Dr. Sukumar's survey sought to solicit data on the impact on consumer demand of the H.264 and 802.11 capabilities in Microsoft's Xbox console. The H.264 and 802.11 capabilities implicate Motorola's standard essential patents at issue in this litigation for which the court is attempting to determine a RAND royalty rate. Thus, Dr. Sukumar's survey is admissible as relevant under FRE 401 and 402 and is sufficiently reliable under FRE 702 and *Daubert.* Accordingly, Microsoft's motion to exclude Dr. Sukumar's testimony is denied.

## B. Motorola's *Daubert* Motion

Motorola moves to exclude certain testimony of three of Microsoft's expert witnesses—doctors Kevin M. Murphy, Matthew R. Lynde, and Timothy S. Simcoe—on the grounds that their opinions are not based on a reliable methodology. (Motorola Mot. at 5.) Doctors Murphy, Lynde, and Simcoe opine that the proper framework to determine a RAND royalty rate between Motorola and Microsoft is that of an *ex ante*, multilateral negotiation involving full participation of standard essential patent holders and potential standards implementers. (*See generally* Murphy Decl. (Dkt. # 408–1); Lynde Decl. (Dkt. # 408–2); Simcoe Decl. (Dkt. # 408–3).) Thus, Microsoft's proposed hypothetical negotiation includes two requirements: (1) that it occur *ex ante* to adoption of the standard, and (2) that it include multiple patent holders and implementers. Motorola argues that there is no support for the idea that RAND terms are determined through multilateral negotiations, but instead asserts that such terms are determined based on bilateral negotiations between the patentee and implementer.[7] (Motorola Mot. at 6.)

In support of its argument, Motorola contends that the language of Motorola's agreements with IEEE and ITU make clear that negotiations for RAND license agreements are bilateral in nature, such that they occur between only the patentee and the implementer. Motorola directs the court to statements of the ITU's Legal Officer and statements in the IEEE and ITU policies regarding the expectation of bilateral negotiations towards a RAND license. (Motorola Mot. at 7–10.) Motorola also asserts that industry participants and academics understand that a RAND license is the product of bilateral negotiations between the patentee and implemen-

ter and directs the court to a litany of literature to support thereof. (*Id.* at 10–12.) Finally, Motorola asserts that Microsoft's own experts have previously testified that RAND terms are the result of bilateral negotiations. (*Id.* at 13–14.)

Microsoft responds that its *ex ante*, multilateral "lens" for determining a RAND royalty rate properly addresses two key risks presented by licensing of standard essential patents: (1) "improper capture of the "hold-up" value of the standard as the result of the patentee's ability to leverage its monopoly over implementers of the standard; and (2) stacking of royalties by many holders of essential patents, resulting in unreasonable royalty burdens on the implementer. (Microsoft Resp. (Dkt. # 410) at 6.) Microsoft asserts that its proposed framework for determining a RAND rate provides the proper parameters where all licensors appreciate the potential impact of their individual licensing positions and recognize that the aggregate royalties must be sufficiently reasonable as to allow widespread implementation of the standard. (*Id.* at 6–7.) Analogizing determination of a RAND rate in the present case to patent pools for the H.264 and 802.11 standards, namely the MPEG LA (H.264) and Via (802.11) pools, Microsoft contends that such pools reflect real-world form of multilateral licensing which alleviate the aforementioned concerns by addressing all interested parties.

At the upcoming November 13 trial, the court will determine a RAND royalty rate and range. In determining this rate and range, the court must employ a methodology which in some way reconstructs the negotiation that would have taken place between Microsoft and Motorola. From its review of prior case law, the court can

---

7. Motorola does not appear to dispute that opinion testimony related to *ex ante* negotiations is admissible under *Daubert*. (See generally Motorola Mot.)

find no instance where a prior court has been called upon to make a determination of a reasonable royalty rate for a block of standard essential patents held out by the patent holder for licensing on RAND terms. Moreover, while much publication and scholarly writings has dealt with the notion of RAND and its importance to industry standards, limited publication exists on the methodology a court should employ to determine a RAND royalty rate when negotiations between the patent holder and implementer break down. With this in mind, the court examines the reliability of Microsoft's proposed *ex ante*, multilateral framework.

■ The court notes at the outset that the typical manner for establishing the reliability of expert testimony is not met in this case with respect to the "multilateral" prong of Microsoft's proposed framework. The testimony relating to a multilateral negotiation for determining a RAND royalty rate has not "been subjected to peer review and publication." *See Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir.2003) (stating that whether expert testimony has "been subjected to normal scientific scrutiny through peer review and publication" is one of the primary criteria for establishing reliability). This does not mean, however, that this testimony is inadmissible under *Daubert*. Indeed, the *Clausen* court stated, "[t]here may well be good reasons why a scientific study has not been published. For example, it may be too recent or of insufficiently broad interest." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 n. 9 (9th Cir.1995)). Where peer review and publication are absent, "the experts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific evidence method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.*

■ Here, Microsoft's framework for reconstructing a hypothetical negotiation under the circumstances unique to this case seeks to address two well-founded concerns: holdup and stacking. Both hold-up and stacking are widely recognized concerns in the context of standard essential patent licensing. (*See, e.g.,* Simcoe Decl. ¶¶ 81, 91.) The risk of hold-up exists because each standard essential patent holder has monopoly power of the implementers of the standard and may "hold up" an implementer after adoption of a standard while demanding unreasonably high royalty rates for a license to standard essential patents. (*Id.* ¶ 80; Murphy Decl. ¶ 44.) In this hold-up situation, the implementer is compelled to pay a higher rate to gain the benefits of interoperability with complementary products and recoup investments in designing and producing products made in reliance on the industry standard. (Murphy Decl. ¶ 45.) Microsoft's proposed framework seeks to address this concern by contemplating a negotiation (for determining a RAND rate) at a time just prior to adoption of the standard, thereby eliminating excess value added to the patents through the adoption of the standard. (Simcoe Decl. ¶ 62.) Indeed, this *ex ante* interpretation of a RAND royalty rate has been endorsed by numerous publications and the Federal Trade Commission. (*Id.* ¶ 62, 99–108 (listing various publications endorsing *ex ante* negotiations in RAND context).)

Similarly, the concern of stacking is widely understood as a practical concern when licensing standard essential patents. (Simcoe Decl. ¶ 91.) The stacking concern arises because numerous patent holders

lay claim to standard essential patents requiring an implementer in theory to take numerous licenses before utilizing a standard. (*Id.* ¶ 89.) Here, there are almost 100 organizations that have submitted letters of assurance to the IEEE for the 802.11 standard and roughly 230 organizations with declared essential patents for the H.264 standard. (Lynde Decl. at 25.) Accordingly, an implementer may be subjected to cumulative demands for licenses to essential patents, which could lead to economically unsustainable royalty payments. (Simcoe Decl. ¶ 89.) To address this concern, Microsoft's proposed framework envisions a hypothetical negotiation between multiple patent holders and multiple implementers so that, among other things, stacking concerns of the implementer can be addressed during the negotiation. To this point, in real world application, owners of standard essential patents use patent pools or other collective licensing agreements to license their intellectual property. (Murphy Decl. ¶ 22.) Such patent pools serve as a "one-stop shop," allowing parties interested in a standard to gather many (or all) of the patents necessary to implement the technology rather than obtaining patent licenses from each patent holder individually. (*Id.*) One such patent pool is the "MPEG LA," which licenses patents the H.264 standard. (*Id.* ¶ 23.)

Based on the foregoing, the court concludes that, for purposes of a *Daubert* challenge, Microsoft's proposed framework reasonably relies upon and logically addresses widely acknowledged and published concerns of hold-up and stacking found in licensing standard essential patents. The fact that multilateral license agreements for standard essential patents, including the H.264 patents, do indeed occur in practice adds to the reliability of Microsoft's proposed framework. Motorola has only challenged Microsoft's stated stacking and hold-up concerns insofar as they apply to the case at hand. But, the court's duty at this time is to develop a methodology for reconstructing a hypothetical negotiation between Microsoft and Motorola in a general sense and then apply that methodology to the specific circumstances of the case at hand.

Although without hearing evidence of competing experts, the court cannot with certainty set forth the proper parameters for a hypothetical negotiation, any such hypothetical negotiation may indeed address the widely acknowledged concerns of hold-up and stacking implicit in a RAND licensing negotiation for standard essential patents. *Primiano,* 598 F.3d at 565–66 ("Lack of certainty is not, for a qualified expert, the same thing as guesswork."); *Sandoval–Mendoza,* 472 F.3d at 655–56 (lack of certainty does not preclude introduction of medical expert opinion testimony where medical knowledge "permits the assertion of a reasonable opinion"); *Obrey v. Johnson,* 400 F.3d 691, 696 (9th Cir. 2005) (evidence is admissible if the evidence is relevant and the expert's methods are sound). Certainly, Microsoft's proposed framework is subject to criticism. Every possibility exists that Microsoft's stacking concern could be addressed through a bilateral negotiation, as opposed to Microsoft's proposed multilateral negotiation. Additionally, as Microsoft's counsel admitted at oral argument, an *ex ante* negotiation may not fully, or at all, address Motorola's *ex post* promise that it license its standard essential patents on RAND terms. Such discrepancies between the methodology and the circumstances of the present case can be addressed at trial through cross examination. *Bergen v. F/V St. Patrick,* 816 F.2d 1345, 1352 n. 5 (9th Cir.1987) ("[t]he weakness in the underpinnings of [expert] opinions may be developed upon cross-examination," as "such

weakness goes to the weight and credibility of the testimony" as opposed to its admissibility).

## V. CONCLUSION

Based on the foregoing, the court DENIES Motorola's motion (Dkt. # 393) to exclude testimony related to *ex ante*, multilateral negotiations to determine a RAND royalty rate. The court also DENIES Microsoft's motion (Dkt. # 396) to exclude testimony of Charles Donohoe and survey evidence of Dr. Sukumar.